Case No. 12-56275

# United States Court of Appeals for the Ninth Circuit

XL SPECIALTY INSURANCE CO., *et al.*,

*Appellees,*

v.

MICHAEL W. PERRY, *et al.*,

*Appellants.*

*On Appeal from the United States District Court for the Central District of California, Case No. 2:11-cv-2078-RGK-JCG (Hon. R. Gary Klausner, J.)*

## BRIEF OF APPELLANT ALFRED H. SIEGEL, CHAPTER 7 TRUSTEE

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 Avenue of the Stars, Suite 3900
Los Angeles, California 90067
(310) 407-4000

JENNER & BLOCK LLP
633 West 5th Street, Suite 3600
Los Angeles, California 90071
(213) 239-5100

BUCKLEYSANDLER LLP
1250 24th Street N.W., Suite 700
Washington, District of Columbia 20037
(202) 349-8000

*Attorneys for Alfred H. Siegel, Chapter 7 Trustee for IndyMac Bancorp, Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, appellant Alfred H. Siegel, solely in his capacity as chapter 7 trustee (the "Trustee") for IndyMac Bancorp, Inc. ("Bancorp"), states that neither the Trustee nor Bancorp's chapter 7 bankruptcy estate has any parent corporation or any shareholders.  Bancorp is a publicly held Delaware corporation with no parent corporation and no corporate shareholder owning 10% or more of its common stock.


Dated: April 22, 2013              KLEE, TUCHIN, BOGDANOFF & STERN LLP
                                                              *and*
                                                  JENNER & BLOCK LLP
                                                              *and*
                                                BUCKLEYSANDLER LLP


                                    By:_____*/s/ Robert J. Pfister*_____
                                              Robert J. Pfister of Klee, Tuchin, Bogdanoff &
                                              Stern LLP, one of the attorneys for appellant
                                              Alfred H. Siegel, chapter 7 trustee

i

# TABLE OF CONTENTS

**Page(s)**

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF CONTENTS............................................................................ ii

TABLE OF AUTHORITIES ....................................................................iv

INTRODUCTION ....................................................................................1

JURISDICTIONAL STATEMENT ............................................................7

ISSUES PRESENTED................................................................................7

STANDARD OF REVIEW .........................................................................8

STATEMENT OF THE CASE.....................................................................9

    A.    Nature of the Case ...................................................................9

    B.    Course of Proceedings............................................................10

    C.    Disposition Below ..................................................................11

STATEMENT OF RELEVANT FACTS ....................................................12

    A.    The *Tripp* Action ..................................................................12

    B.    Bancorp's Insurance Program ...............................................13

    C.    The Bank's Demise and Bancorp's Chapter 7 Filing .........................18

    D.    The Trustee's Judgment ........................................................19

    E.    The Coverage Action..............................................................21

SUMMARY OF THE ARGUMENT ..........................................................25

ARGUMENT ..........................................................................................27

I.    THE DISTRICT COURT ERRED BY GRANTING THE INSURERS
    SUMMARY JUDGMENT..................................................................27

A.   The Lower Court Misconstrued the Interrelated Wrongful Acts Exclusions ...................................................................................27

    1.   The Language of the Interrelated Wrongful Acts Exclusions ...............................................................28

    2.   The District Court's Recasting of the Exclusions.....................31

B.   Controlling Case Law Establishes That the Interrelated Wrongful Acts Exclusions Do Not Apply to Different Legal Claims Brought by Different Parties to Redress Different Injuries........................................................................................34

    1.   Ninth Circuit Cases – *FMA* and *Eureka* ..................................35

    2.   California Law – *Bay Cities* and Progeny ................................38

    3.   Additional Authorities .............................................43

C.   The Interrelated Wrongful Acts Exclusions Must be Construed Consistently With the Basic Purpose of Claims-Made Insurance Policies to Afford Coverage for Claims First Asserted in the Policy Period ......................................................................46

II.   THE TRUSTEE IS ENTITLED TO SUMMARY JUDGMENT FOR $35 MILLION ............................................................................50

A.   Where Policy Language is Reasonably Susceptible to an Interpretation Affording Coverage, It Must Be So Construed...........51

B.   The Interrelated Wrongful Acts Exclusions Are Reasonably Susceptible to the Trustee's Proffered Interpretation .........................54

CONCLUSION ..........................................................................................57

CERTIFICATE OF COMPLIANCE.........................................................58

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*20th Century Ins. Co. v. Liberty Mut. Ins. Co.*,
  965 F.2d 747 (9th Cir. 1992) ................................................................8

*ACE Am. Ins. Co. v. Ascend One Corp.*,
  570 F. Supp. 2d 789 (D. Md. 2008) ...................................................44

*Blue Chip Stamps v. Manor Drug Stores*,
  421 U.S. 723 (1975)...........................................................................13

*Christian Legal Soc'y v. Martinez*,
  130 S. Ct. 2971 (2010).......................................................................22

*Church Mut. Ins. Co. v. U.S. Liab. Ins. Co.*,
  347 F. Supp. 2d 880 (S.D. Cal. 2004).................................................40

*Cont'l Cas. Co. v. Richmond*,
  763 F.2d 1076 (9th Cir. 1985) ...........................................................52

*Eastwood Ins. Servs., Inc. v. U.S. Specialty Ins. Co.*,
  391 F. App'x 611 (9th Cir. 2010) .......................................................37

*Eureka Fed. Sav. & Loan v. Am. Cas. Co.*,
  873 F.2d 229 (9th Cir. 1989) ...........................................34, 36, 37, 44

*Exxon Co., U.S.A. v. Sofec, Inc.*,
  517 U.S. 830 (1996)...........................................................................33

*Fed. Ins. Co. v. Raytheon Co.*,
  426 F.3d 491 (1st Cir. 2005)...............................................................32

*Fed. Deposit Ins. Corp. v. Mmahat*,
  907 F.2d 546 (5th Cir. 1990) ..............................................................43

*Fed. Sav. & Loan Ins. Corp. v. Burdette*,
  718 F. Supp. 649 (E.D. Tenn. 1989)...................................................44

*Fin. Mgmt. Advisors, LLC v. Am. Int'l Specialty Lines Ins. Co.*,
  506 F.3d 922 (9th Cir. 2007) ...........................................34, 35, 37, 48

*First Nat'l Mtg. Co. v. Fed. Realty Inv. Trust*,
    631 F.3d 1058 (9th Cir. 2011) ..............................................................9

*Holmes v. Sec. Investor Prot. Corp.*,
    503 U.S. 258 (1992)..............................................................33

*Int'l Union of Operating Eng'rs Trust Funds v. Karr*,
    994 F.2d 1426 (9th Cir. 1993) ..............................................48

*James River Ins. Co. v. Kemper Cas. Ins. Co.*,
    585 F.3d 382 (7th Cir. 2009) ..............................................30

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
    519 F.3d 1025 (9th Cir. 2008) ..............................................8

*N. River Ins. Co. v. Huff*,
    628 F. Supp. 1129 (D. Kan. 1985)....................................45

*Okada v. MGIC Indem. Corp.*,
    823 F.2d 276 (9th Cir. 1986) ..............................37, 44, 48

*Oswalt v. Resolute Indus., Inc.*,
    642 F.3d 856 (9th Cir. 2011) ..............................................8

*Ryan v. Nat'l Union Fire Ins. Co.*,
    692 F.3d 162 (2d Cir. 2012) ..............................................43

*Santa Fe Indus., Inc. v. Green*,
    430 U.S. 462 (1977)..............................................................13

*Torch Liquidating Trust v. Stockstill*,
    561 F.3d 377 (5th Cir. 2009) ..............................................21

*Tower Ins. Co. v. Capurro Enters., Inc.*,
    2012 U.S. Dist. LEXIS 46443 (N.D. Cal. 2012) ................52

*Trident Ctr. v. Conn. Gen. Life Ins. Co.*,
    847 F.2d 564 (9th Cir. 1988) ..............................................9, 23

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976)..............................................................33

*United Nat'l Ins. Co. v. Spectrum Worldwide, Inc.*,
  555 F.3d 772 (9th Cir. 2009) ...............................................................9

*Wallis v. Princess Cruises, Inc.*,
  306 F.3d 827 (9th Cir. 2002) ...............................................................8

**STATE CASES**

*Acceptance Ins. Co. v. Syufy Enters.*,
  81 Cal. Rptr. 2d 557 (Ct. App. 1999) ................................................40

*Allmerica Fin. Corp. v. Certain Underwriters at Lloyd's, London*,
  871 N.E.2d 418 (Mass. 2007) .............................................................45

*Aydin Corp. v. First State Ins. Co.*,
  959 P.2d 1213 (Cal. 1998) ..................................................................22

*Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.*,
  855 P.2d 1263 (Cal. 1993) ...........................................................*passim*

*Charles E. Thomas Co. v. Transamerica Ins. Grp.*,
  72 Cal. Rptr. 2d 577 (Ct. App. 1998) ................................................52

*Dore v. Arnold Worldwide, Inc.*,
  139 P.3d 56 (Cal. 2006) ......................................................................54

*Feldman v. Illinois Union Ins. Co.*,
  130 Cal. Rptr. 3d 770 (Ct. App. 2011) ..................................40, 41, 42

*Friedman Prof'l Mgmt. Co. v. Norcal Mut. Ins. Co.*,
  15 Cal. Rptr. 3d 359 (Ct. App. 2004) ....................................41, 42, 48

*Homestead Ins. Co. v. Am. Empire Surplus Lines Ins. Co.*,
  52 Cal. Rptr. 2d 268 (Ct. App. 1996) ........................................46, 49

*MacKinnon v. Truck Ins. Exch.*,
  73 P.3d 1205 (Cal. 2003) .............................................25, 51, 52, 53

*Medill v. Westport Ins. Co.*,
  49 Cal. Rptr. 3d 570 (Ct. App. 2006) ................................................40

*Merrill & Seeley v. Admiral Ins. Co.*,
  275 Cal. Rptr. 280 (Ct. App. 1990) ...................................................46

*ML Direct, Inc. v. TIG Specialty Ins. Co.*,
  93 Cal. Rptr. 2d 846 (Ct. App. 2000) ................................................................42

*Montrose Chem. Corp. v. Admiral Ins. Co.*,
  913 P.2d 878 (Cal. 1995) ..............................................................................21, 47

*Morey v. Vannucci*,
  75 Cal. Rptr. 2d 573 (Ct. App. 1998) ................................................................56

*Nat'l Auto & Cas. Ins. Co. v. Stewart*,
  272 Cal. Rptr. 625 (Ct. App. 1990) ..................................................................56

*Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*,
  442 P.2d 641 (Cal. 1968) ........................................................................9, 53, 54

*Reserve Ins. Co. v. Pisciotta*,
  640 P.2d 764 (Cal. 1982) ..................................................................................56

*Safeco Ins. Co. of Am. v. Robert S.*,
  28 P.3d 889 (Cal. 2001) ....................................................................................53

*Scott v. Cont'l Ins. Co.*,
  51 Cal. Rptr. 2d 566 (Ct. App. 1996) ................................................................29

*Southridge Capital Mgmt., LLC v. Twin City Fire Ins. Co.*,
  2006 Conn. Super. LEXIS 2754 (Sept. 8, 2006) ................................................32

*Sparks v. St. Paul Ins. Co.*,
  495 A.2d 406 (N.J. 1985) ..................................................................................47

*State Farm Mut. Auto Ins. Co. v. Jacober*,
  514 P.2d 953 (Cal. 1973) ............................................................................52, 53

*State Farm Mut. Auto. Ins. Co. v. Partridge*,
  514 P.2d 123 (Cal. 1973) ............................................................................51, 52

## STATUTES AND RULES

28 U.S.C. § 157(d) ................................................................................................20

28 U.S.C. § 1291 ....................................................................................................7

28 U.S.C. § 1332(a) ...............................................................................................7

28 U.S.C. § 1334 .................................................................................7

Fed. R. App. P. 4(a)(1)(A) ...................................................................7

Fed. R. Civ. P. 15(c)(1)(B) ...............................................................29

Fed. R. Civ. P. 30(b)(6) ....................................................................24

Securities Exchange Act of 1934 § 10(b) ...........................................13

**OTHER AUTHORITIES**

4 NEW APPLEMAN ON INSURANCE § 26.02 (2012) ................................46

PROSSER & KEETON ON TORTS § 41 .......................................................33

PROSSER & KEETON ON TORTS § 44 .......................................................33

THE OXFORD ENGLISH DICTIONARY ......................................................28

William A. Hancock, *D&O Liability Ins. Seminar*, 5 CORP. COUNSEL'S Q.
    117, 118 (1989) ............................................................................46

## INTRODUCTION

This case concerns the scope of several functionally identical exclusions (the "Interrelated Wrongful Acts Exclusions") in eight 2008-09 claims-made insurance policies (the "2008-09 Policies") purchased by IndyMac Bancorp, Inc. ("Bancorp"). IndyMac Bank, F.S.B. (the "Bank"), Bancorp's wholly owned subsidiary, failed in July 2008 and was placed in receivership. Bancorp filed for bankruptcy relief, and Alfred H. Siegel (the "Trustee") was appointed bankruptcy trustee.

In 2009, the Trustee sued certain of Bancorp's former directors and officers (the "Former Ds&Os") for corporate waste and breach of fiduciary duty.[1] The Trustee challenged the Former Ds&Os' decision to transfer $355 million of Bancorp's assets beyond the reach of Bancorp's creditors between September 2007 and May 2008, as Bancorp was careening toward its July 2008 bankruptcy filing. Shortly before trial, the Trustee Action was settled by stipulated $35 million judgment (the "Judgment"). The Former Ds&Os assigned to the Trustee their rights to indemnity in respect of the Judgment under the 2008-09 Policies. The Trustee then intervened in this insurance coverage dispute,[2] seeking to collect $35 million from the 2008-09 Policies.

---

[1] *Siegel v. Caldera (In re IndyMac Bancorp, Inc.)*, No. 2:09-ap-02645 (Bankr. C.D. Cal.) (the "Trustee Action").

[2] *XL Specialty Ins. Co. v. Perry*, No. 2:11-cv-2078 (C.D. Cal.) (the "Coverage Action").

The sole remaining issue on competing summary judgment motions below was whether the Interrelated Wrongful Acts Exclusions in the 2008-09 Policies exclude the Judgment – that is, whether the Former Ds&Os' liability for stripping $355 million out of Bancorp between September 2007 and May 2008 relates back to the "*Tripp* Action,"[3] a securities fraud class action filed by Bancorp's shareholders and noticed as a claim under Bancorp's 2007-08 liability insurance (the "2007-08 Policies").  With the 2007-08 Policies now exhausted, the question of whether the Judgment is a claim made under the 2008-09 Policies or relates back to the *Tripp* Action is decisive.

After the *Tripp* Action was filed, Bancorp paid more than $6 million for the 2008-09 Policies.  They are "claims-made" policies – the great virtue of which is supposed to be the certainty concerning what is covered, or not covered, by a particular policy.  When a policy year closes without a claim being made, the claims-made insurer need not reserve against potential future liabilities based on wrongful acts that have not yet, and may never, ripen into actual claims.  From the policyholder's standpoint, claims may simply be tendered as and when they arise under the policy that is then in force.  Losses arising out of claims are then paid by the policy to which the claim was initially tendered.  Here, the Trustee's claim was

---

[3]  *Tripp v. IndyMac Bancorp, Inc.*, No. 2:07-cv-1635 (C.D. Cal.) (the "*Tripp* Action" or "*Tripp*").

first made during the 2008-09 policy year and timely tendered under the 2008-09 Policies.  No claim was, or could have been, made by the Trustee in any prior policy year.  Upon settlement of the Trustee Action, the claim ripened into a $35 million loss, payable from the 2008-09 Policies.

The Trustee Action cannot be considered part and parcel of the *Tripp* Action under the Interrelated Wrongful Acts Exclusions.  *Tripp* sought to impose liability for failure in 2006 and 2007 to disclose to the investing public, as required by the federal securities laws, the Bank's 2006-era unsound mortgage underwriting practices.  By contrast, the Trustee Action centered on the subsequent decision (in late 2007 and early 2008) by the Former Ds&Os to move $355 million of Bancorp's assets beyond the reach of Bancorp's creditors.  In nevertheless holding that the Trustee Action relates back to *Tripp* and the 2007 policy year, the district court (1) mischaracterized the language of the Interrelated Wrongful Acts Exclusions, (2) ignored virtually all the applicable case law to find that different harms, suffered by different parties, at different times, based on different wrongs, under different legal theories constitute the same Claim for insurance purposes, and (3) discounted testimony from the Insurers' own representatives supporting a narrower interpretation of the supposedly unambiguous Interrelated Wrongful Acts Exclusions than that adopted by the district court.

According to the district court, the Bank's 2006-era lax underwriting practices not only made Bancorp's 2006 and 2007 securities filings materially false as alleged in *Tripp*, they also left the Bank and Bancorp in a "difficult financial situation." ER:18. The district court reasoned that this difficult financial situation later motivated the Former Ds&Os to transfer $355 million out of Bancorp. On that basis, the court concluded that the otherwise distinct Trustee Action "directly result[ed]" from *Tripp* and therefore fell within the Interrelated Wrongful Acts Exclusions. *Id.* According to the district court the two litigations shared or involved a common remote cause: Had there not been bad underwriting practices at the Bank, then Bancorp's securities filings would not have been materially false as *Tripp* alleged; nor, the district court reasoned, would the Bank have subsequently suffered from the extreme financial distress that motivated the Former Ds&Os to approve the asset-stripping that formed the gravamen of the Trustee Action. Thus, according to the district court, the Interrelated Wrongful Acts Exclusions took the Trustee Action out of the policy year in which it was made, and required that it be related-back to the otherwise entirely distinct *Tripp* claim noticed under the prior year's insurance policies.

The result below violates longstanding California law governing insurance contracts generally and policy exclusions particularly. Any two claims against the same policyholder necessarily share or involve some common facts, and any cor-

4

porate decision (wrongful or not) will somehow relate to the financial condition of the policyholder.  Under the district court's approach, the insurers to which the *Tripp* Action was originally tendered are responsible for all future claims against Bancorp that are motivated by its financial condition, even if those claims arise when later claims-made policies are in force and involve independent wrongful acts that harm different parties in different ways and violate different laws.

Neither the Interrelated Wrongful Acts Exclusions nor the extensive case law interpreting similar exclusions (including binding Ninth Circuit authorities) treat claims that concern different harms, suffered by different parties, at different times, based on different wrongs, under different legal theories, as the same claim under claims-made insurance policies.  In a claims-made framework, Bancorp and Bancorp's Former Ds&Os cannot be expected to anticipate that independent future wrongful acts (here, stripping assets out of Bancorp; in *Tripp*, failing to disclose poor underwriting practices) that harm different parties (here, Bancorp's creditors; in *Tripp*, shareholders who purchased common stock at inflated prices) and violate different legal duties (here, state law fiduciary duties; in *Tripp*, federal securities laws) are the same claim simply because the future wrongful acts share any common underlying facts with *Tripp*.

As the liability insurance marketplace has moved toward the claims-made framework (in place of older "occurrence"-based coverage), courts have grappled

with provisions like the Interrelated Wrongful Acts Exclusions at issue here. Some cases find that such exclusions apply if the nucleus of operative facts, the underlying injury and the claimant are the same – even if there are multiple wrongful acts. Other cases hold that these exclusions apply if the same wrongful act harms different parties but violates their legal rights in the same way. And still other decisions have concluded that claims are deemed the same if the same facts and conduct give rise to liability to the same or different parties on different legal theories.

But in the extensive case law that has grown up over these policy provisions, ***no court*** has gone so far as the district court here. ***No case*** stands for the proposition that two claims involving different harms, to different parties, at different times, based on different wrongs, under different legal theories, are nevertheless the same claim for insurance purposes just because they share any common fact. The district court's contrary conclusion is reversible error, and – consistent with well-settled, binding authority from this Court and the California Supreme Court concerning the construction of insurance contracts – the case must be remanded with instructions to enter judgment in favor of the Trustee for $35 million.

## JURISDICTIONAL STATEMENT

The district court had original jurisdiction pursuant to 28 U.S.C. §§ 1332(a) & 1334.  On June 27, 2012, the district court granted summary judgment on all claims and as to all parties, and entered final judgment on July 3, 2012.  ER:10-24. The Trustee timely appealed on July 6, 2012.  ER:25-43.  *See* Fed. R. App. P. 4(a)(1)(A).  This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.    Whether the district court erred in holding that the Trustee Action – a suit against Bancorp's Former Ds&Os for corporate waste and breach of fiduciary duty in transferring, between September 2007 and May 2008, $355 million of Bancorp's assets beyond the reach of creditors – is excluded from coverage under the 2008-09 Policies because the Trustee Action shared or involved any fact in common with *Tripp*, a federal securities class action brought by Bancorp's shareholders claiming they overpaid for their stock on account of misrepresentations in Bancorp's 2006 and 2007 press releases and SEC filings.

2.    Whether this case should be remanded with instructions to enter judgment in the Trustee's favor for $35 million given that: (i)  the sole disputed issue between the Insurers and the Trustee is whether the Interrelated Wrongful Acts Exclusions eliminate coverage for the Trustee's $35 million Judgment; and (ii) the testimony of the Insurer representatives who negotiated and administered the 2008-

7

09 Policies – erroneously ignored below because they "are not lawyers," ER:15 – demonstrated that the policies are reasonably susceptible to a construction under which coverage is available for the Judgment.

## STANDARD OF REVIEW

This Court "review[s] de novo the district court's grant of summary judgment." *Oswalt v. Resolute Indus., Inc.*, 642 F.3d 856, 859 (9th Cir. 2011). "We determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Wallis v. Princess Cruises, Inc.*, 306 F.3d 827, 832 (9th Cir. 2002).

The "relevant substantive law" is California state law governing insurance coverage disputes, which is highly protective of policyholders and their reasonable expectations. Policy provisions granting coverage are "'interpreted broadly so as to afford the greatest possible protection to the insured,'" whereas policy provisions limiting coverage are "'interpreted narrowly against the insurer.'" *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1032 (9th Cir. 2008) (citation omitted). "The general rule is that if coverage is available under any reasonable interpretation of an ambiguous clause of an insurance policy, the insurer cannot escape its obligation." *20th Century Ins. Co. v. Liberty Mut. Ins. Co.*, 965 F.2d 747, 751 (9th Cir. 1992).

8

The general contract interpretation principle of *Pacific Gas & Electric Co. v. G.W. Thomas Drayage & Rigging Co.*, 442 P.2d 641, 643-46 (Cal. 1968) ("*PG&E*"), concerning the interplay between ambiguity and extrinsic evidence in contract interpretation, also applies here. Under *PG&E*, even contract provisions that appear clear and unambiguous on their face may be shown through extrinsic evidence to be reasonably susceptible to more than one interpretation. *First Nat'l Mtg. Co. v. Fed. Realty Inv. Trust*, 631 F.3d 1058, 1066-67 (9th Cir. 2011).

In non-insurance contract disputes, if extrinsic evidence reveals that the contract is "reasonably susceptible" to more than one interpretation, courts must sift through the evidence to determine which of the competing reasonable interpretations is correct. *E.g.*, *Trident Ctr. v. Conn. Gen. Life Ins. Co.*, 847 F.2d 564, 569-70 (9th Cir. 1988). But under California's special rules for interpreting insurance policies, applicable here, ambiguous policy language that is reasonably susceptible to an interpretation favoring coverage affords that coverage. *United Nat'l Ins. Co. v. Spectrum Worldwide, Inc.*, 555 F.3d 772, 777 (9th Cir. 2009) (courts "'must resolve the ambiguity in favor of the insured'" (citation omitted)).

## STATEMENT OF THE CASE

### A.    Nature of the Case

This action is for declaratory relief concerning insurance coverage under the 2008-09 Policies. The Trustee's claims against Bancorp's Former Ds&Os were

first reported during the 2008-09 policy period, and were thereafter reduced to judgment via settlement. The merits of the Trustee's claims, the good faith and validity of the $35 million settlement and resulting Judgment, and the timeliness of the tender of claims under the 2008-09 Policies were resolved by stipulation, and are not at issue in this appeal.

The 2008-09 Policies contain a series of functionally identical exclusions (defined above as the "Interrelated Wrongful Acts Exclusions") by which claims made in a prior policy year are excluded from coverage under the 2008-09 Policies. Thus, a claim originally tendered in a prior policy year will be covered only in the year in which it was first tendered; re-tendering it in 2008-09 does not double the amount of coverage available. The sole issue on appeal is whether the Interrelated Wrongful Acts Exclusions bar coverage for the Trustee's Judgment notwithstanding the undisputed fact that the Trustee Action from which the Judgment arose is otherwise a claim properly made during the 2008-09 policy period.

## B.    Course of Proceedings

The Coverage Action was filed in March 2011 by four insurers: XL, Arch, ACE, and Axis. Five additional insurers (Lloyd's, Catlin, Zurich, Twin City, and Continental) became parties through intervention or as counterclaim defendants. These nine parties (all appellees in this Court) are referred to as the "Insurers." They issued the 2008-09 Policies.

The original defendants in the Coverage Action were Michael Perry, Bancorp's former CEO; eight individuals who served as Bancorp's former outside directors (with Perry, the "Former Ds&Os"); and twelve other former officers of Bancorp who (with Perry) were defendants in other IndyMac-related litigation. The Trustee substituted into the Coverage Action for the Former Ds&Os.  ER:1-9.[4]

The Trustee and the Insurers cross-moved for summary judgment.  No one contended that genuine issues of material fact existed.  Rather, the competing summary judgment motions argued that the undisputed facts – the language of the policies, the testimony of the Insurer representatives who drafted and administered the policies, and the allegations made and resolved in the Trustee Action and the *Tripp* Action – compelled judgment in favor of either the Insurers or the Trustee.

### C.    Disposition Below

On June 27, 2012, the district court granted the Insurers' motions for summary judgment and denied the Trustee's cross-motion.  ER:10-20.  The district court thereafter entered final judgment, ER:21-24, from which the Trustee timely appealed, ER:25-43.  The Trustee's appeal was followed by timely appeals from Perry and other defendants below.  *See supra* note 4.

---

[4]    Perry remained a defendant in the Coverage Action in respect of other litigation to which he is a party.  He and five others (appellants Van Dellen, Rothman, Shellem, Koon, and Keys) separately appealed.  Appellant Rothman assigned his claims to the FDIC, which has been substituted in his place.

## STATEMENT OF RELEVANT FACTS

### A.    The *Tripp* Action

*Tripp* was filed in March 2007.  ER:525-77.[5]  It was a class action securities fraud case alleging that certain public statements made by Bancorp between January 2006 and January 2007 were false and misleading.  ER:525-32.  The statements included a January 2006 press release, ER:536-40; an April 2006 press release and SEC filing, ER:541-45; a June 2006 press release, ER:545-46; a July 2006 press release and SEC filing, ER:547-49; and a November 2006 press release and SEC filing, ER:549-55.  According to the *Tripp* complaint, the statements were materially false because they "failed to disclose the [Bank's] inadequate internal controls or that [the Bank's] underwriting guidelines and loss provisions were inadequate to manage the risk of loan delinquencies."  ER:546-47.

The *Tripp* plaintiff class further alleged that the Bank's inadequate practices began to be revealed in January 2007, with a press release that began, "Unfortunately, we are starting the year off with some bad news."  ER:555.  However, even that press release "did not fully disclose [the] problems," ER:557, nor did another nine days later, ER:557-65.  Finally, however, on March 1, 2007, the Bank issued a

---

[5]    Originally styled *Reese vs. IndyMac Financial, Inc.* (ER:525), after an additional plaintiff was added, the case was restyled as *Tripp* (ER:176).  The *Tripp* complaint was amended six more times (ER:176) before settling in 2012 for $5.5 million, *see* Compl. ¶30, *Arch Ins. Co. v. Perry*, No. 2:12-cv-06290 (C.D. Cal.).

third corrective press release, ER:565-73, revealing the full truth: "On this news, IndyMac's stock immediately collapsed to close on March 1, 2007 at $32.16 per share, down from $34.33 per share the prior day."  ER:573.

The *Tripp* plaintiffs sought damages resulting from their purchase of Bancorp stock prior to March 1, 2007 at artificially inflated prices, in reliance on Bancorp's alleged 2006-era misstatements and omissions.  ER:574.  The legal basis of their claims is section 10(b) of the Securities Exchange Act of 1934, which creates a carefully circumscribed remedy for misstatements or omissions in relation to the purchase of publicly traded securities.  *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 749 (1975) (remedy limited to actual purchasers and sellers of securities); *see also Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977) ("Congress by § 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement.").

### B.    Bancorp's Insurance Program

When *Tripp* was filed in March 2007, Bancorp's insurance program (the 2007-08 Policies) consisted of a "tower" of eight policies of $10 million each, providing $80 million in aggregate claims-made coverage.  ER:12.[6]  As *Tripp* was being litigated, Bancorp began negotiating for the 2008-09 Policies.  *See, e.g.*,

---

[6]    The district court sometimes referred to the 2007-08 Policies as "Tower One," and to the 2008-09 Policies as "Tower Two."  ER:10-12.

ER:1468-73 (underwriting worksheet dated April 2008). During those negotiations, all but one of the same insurers issuing Bancorp's 2007-08 Policies sought Bancorp's continued business for the 2008-09 policy year. Internal underwriting documents produced during discovery reveal that the insurers sought to "ring-fence" the prior policy year's liabilities by excluding "any new claims that are pleaded on the same grounds as the '*Tripp* Litigation.'" ER:1469-70.

The Insurers' reason for issuing $80 million in additional coverage for the 2008-09 policy year was straightforward:

> [T]he stock is at rock bottom (unless they go completely bankrupt …), the issues in their market are well known and they have made full and complete disclosure. Decided to renew on this basis as we have already written the exposure, the revised wording gives comfort – we may as well enjoy the benefit of the revised renewal pricing.

ER:1470-71. The "benefit of the revised renewal pricing" was a $6 million premium – ***250%*** more than Bancorp paid for the 2007-08 Policies. ER:1475. *See also* ER:1380-81 (XL underwriter testifying that "the premium justified the risks").

The 2008-09 Policies are eight separate insurance policies each providing $10 million in insurance. ER:189-368. The first policy in the tower (issued by Lloyd's) provides $10 million in primary coverage, ER:189-231; the next (issued by Zurich) provides $10 million in excess coverage that begins once the Lloyd's policy is exhausted, ER:233-47; and so on. In the aggregate, the 2008-09 Policies provide $80 million of insurance coverage.

14

The 2008-09 Policies are claims-made policies, "which means that coverage is provided for claims that are made during the policy period." ER:13. The policies contain a series of exclusions (referred to above as the "Interrelated Wrongful Acts Exclusions"). Broadly speaking, the Interrelated Wrongful Acts Exclusions prevent policyholders from "double dipping" by tendering the same claim in multiple policy years. *Tripp* was filed during the 2007-08 policy period and was defended by the 2007-08 insurers. The Interrelated Wrongful Acts Exclusions prevent Bancorp from receiving double coverage by simply re-tendering the same complaint (or a variation thereof) under the 2008-09 Policies. In other words, because *Tripp* is allocated to the 2007-08 Policies, it, and other lawsuits sufficiently connected to it, are excluded from the 2008-09 Policies.

The precise wording of the Interrelated Wrongful Acts Exclusions varies between the eight 2008-09 Policies (each a "layer"). The Lloyd's primary policy, ER:189-231, articulates the Interrelated Wrongful Acts Exclusions as follows:

- There is a general form exclusion (§ III(B)) for any "Claim" that is "based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving: (1) any Wrongful Act or any fact, circumstance or situation which has been the subject of any notice given prior to the Policy Period under any other … policy, or (2) any other Wrongful Act whenever occurring, which, together with

15

a Wrongful Act which has been the subject of such notice, would constitute Interrelated Wrongful Acts." ER:207.

- The defined term "Interrelated Wrongful Acts," in turn, means "Wrongful Acts which have as a common nexus any fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events or transactions." ER:205.

- Additionally, an endorsement to the Lloyd's primary policy provides that the "Exclusions" portion of the policy is amended to include claims "based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving the following: 1. the [*Tripp* Action]; or 2. any fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events, or transactions underlying or alleged in the [*Tripp* Action], regardless of any legal theory upon which such Claim is predicated." ER:230.

The second, third, and fourth layers follow form, except that the third layer contains an additional endorsement titled "Excess Absolute Prior Notice Exclusion," which states that the insurer "shall not be liable to make any payment for loss in connection with any claim made against the Insured(s) where all or part of such claim is, directly or indirectly, based on, attributable to, arising out of, resulting from, or in any manner related to wrongful acts or any facts, circumstances or

situations of which notice of claim or occurrence which could give rise to a claim, has been given prior to the effective date of this policy or under any other policy." ER:258.[7]

At the fifth layer, the provisions constituting the Interrelated Wrongful Acts Exclusions change slightly and immaterially:

- The general form exclusion (§ III(B)(2)) applies to any Claim that is "based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance or situation, transaction, event or Wrongful Act which, before the Inception Date of this Policy, was the subject of any notice given under any other [insurance policy]." ER:292.

- A separate provision (§ IV(G)) provides that "All Claims arising from the same Interrelated Wrongful Acts shall be deemed to constitute a single Claim and shall be deemed to have been made at the earliest time at which such earliest Claim is made or deemed to have been made pursuant to [the notice provisions of the policy], if applicable." ER:294.

---

[7] A functionally identical but modified form of this exclusion is present in the fifth, sixth, and seventh layers, except with an earlier cut-off date. ER:305 (fifth layer); ER:330 (sixth layer); ER:343 (seventh layer).

- The defined term "Interrelated Wrongful Acts," in turn, means "any Wrongful Act based on, arising out of, directly or indirectly in consequence of, or in any way involving any of the same or related, or series of related, facts, circumstances, situations, transactions, or events." ER:290.

- Finally, the endorsement that refers to the *Tripp* Action by name, ER:315, is identical to the corresponding endorsement in the Lloyd's primary policy, quoted above.

The sixth (ER:320), seventh (ER:339), and eighth (ER:354) layers follow form, except that the sixth layer includes an identical *Tripp* endorsement (ER:325), and the seventh layer includes an endorsement modifying the definition of "Interrelated Wrongful Acts" to match the primary policy (ER:343).

## C.    The Bank's Demise and Bancorp's Chapter 7 Filing

In late 2007 and early 2008, to shore up the Bank's desperate finances, the Former Ds&Os made a series of transfers – ultimately totaling $355 million – of Bancorp's assets to the Bank.  As alleged in the Trustee Action, these transfers were far too little, too late: the Bank was already hopelessly insolvent, needing many billions in new capital to survive.  In transferring a small fraction of that to the Bank, the Former Ds&Os merely wasted Bancorp's capital.

18

The Office of Thrift Supervision seized the Bank on July 11, 2008 and appointed the FDIC its receiver.  On July 31, 2008, Bancorp filed a chapter 7 bankruptcy petition, which created the bankruptcy estate, and the Trustee was subsequently appointed.  The Trustee's fiduciary duties include, *inter alia*, recovering assets that were improperly transferred pre-bankruptcy, to the detriment of Bancorp's creditors, and asserting claims for breach of fiduciary duty against the Former Ds&Os in respect of those transfers.

### D.    The Trustee's Judgment

Consistent with his fiduciary duties, the Trustee examined the Former Ds&Os' transfers of $355 million of Bancorp's assets in the weeks and months prior to the FDIC's seizure of the Bank.  Thereafter, he filed the Trustee Action in the bankruptcy court against the Former Ds&Os responsible for those transfers.

On motion to dismiss, the FDIC (as receiver for the Bank) attempted to intervene in the Trustee Action, arguing that the Trustee was attempting to recover for harm done to the Bank rather than Bancorp.  The bankruptcy court rejected that argument and authoritatively construed the Trustee Action as seeking redress solely for the $355 million in pre-bankruptcy transfers (a claim that indisputably belongs to Bancorp's bankruptcy estate).[8]

---

[8]    *See* ER:1321-23 (bankruptcy court order limiting the Trustee Action solely to the claim that the Former Ds&Os breached their fiduciary duties to Bancorp in
*(FOOTNOTE CONTINUED)*

For two years, the parties then litigated the Trustee Action strictly on the basis that only the Trustee's asset-stripping claim was at issue. At one point an attempt was made to move the Trustee Action to the district court as allegedly "related" to *Tripp*. *See* 28 U.S.C. § 157(d). That attempt ultimately failed, but while the motion was pending, the district judge presiding over *Tripp* was asked to accept transfer of the Trustee Action. He declined:

> The *Tripp v. IndyMac* and [companion] cases are securities class actions. The new lawsuit [the Trustee Action] appears to be an adversary [proceeding] initially filed in bankruptcy court by the Chapter 7 Trustee against the members of IndyMac's Board of Directors based on legal theories ***totally unrelated*** to any securities violation claims. Thus, the undersigned would not find ***any substantially related or similar question of law or fact*** nor any real duplication of labor if the new action is heard by a new judge.

ER:1369 (emphasis added).

Shortly before trial in the bankruptcy court, the parties resolved the Trustee Action for $35 million, and the Judgment was entered. The Former Ds&Os assigned their insurance rights in respect of the Judgment to the Trustee. It is payable solely from the 2008-09 Policies.[9]

---

connection with the "Downstream Transfers"); ER:1328-67 (settlement agreements resolving the narrowed Trustee Action). *See also* ER:1208-24 (bankruptcy court clarifying the narrowed scope of the Trustee Action).

[9]  In the district court, the Insurers repeatedly asserted that allegations in the original complaint in the Trustee Action establish its gravamen, and they scoured the original complaint's background sections for any mention of risky mortgages, red flags, or the like. That is not the proper analysis. The substance and

*(FOOTNOTE CONTINUED)*

Unlike the federal securities claims alleged in *Tripp* (which were held by individual shareholders), the Trustee's claims against the Former Ds&Os arose from state law and belonged solely to the Trustee. *See Torch Liquidating Trust v. Stockstill*, 561 F.3d 377, 386 (5th Cir. 2009). Recovery of the Judgment will inure to the benefit of Bancorp's creditors, the parties harmed by the pre-bankruptcy asset-stripping. By contrast, the $5.5 million settlement in *Tripp* will be distributed to shareholders who were deceived by false statements into buying publicly traded Bancorp stock at inflated prices in 2006 and 2007.

### E.    The Coverage Action

After obtaining the Judgment, the Trustee intervened in the Coverage Action. The Insurers stipulated that the Trustee's demand letter (the precursor to the Trustee Action) was timely and properly tendered during the 2008-09 policy peri-

---

scope of the Trustee Action was conclusively resolved at the motion to dismiss stage, *see supra* note 8, and the case was litigated strictly on that basis. The district court rejected the Insurers' attempts to recharacterize the Trustee's case as something broader than it actually was, *see* ER:35 & ER:41, and so should this Court. The granting clauses of the 2008-09 Policies require the Insurers to "pay on behalf of the Directors and Officers Loss resulting from any Claim," and the "Loss" here is the $35 million resolution of the "Claim" by settlement of the Trustee Action. ER:202. The distinction between claims (which must be defended even if the allegations that underlie them ultimately turn out to be groundless) versus actual losses (*e.g.*, judgments and settlements, which must be paid if they are within the scope of indemnity) is a well-developed facet of insurance law. *E.g.*, *Montrose Chem. Corp. v. Admiral Ins. Co.*, 913 P.2d 878, 884 n.9 (Cal. 1995).

od, and his subsequent Judgment relates back to the demand letter.[10]  Accordingly, the sole contested issue in the Coverage Action was whether the Trustee Action is deemed (by virtue of the Interrelated Wrongful Acts Exclusions) to relate back to the *Tripp* Action, which was tendered in the prior policy period.[11]

In the district court, the Trustee argued that under the Interrelated Wrongful Acts Exclusions, a later Claim (here, the Trustee Action) only relates back to an earlier Claim (here, *Tripp*) if the two Claims share a legally sufficient nexus. Whether a particular nexus is legally sufficient is a question of degree.  It cannot be the case, for example, that the Trustee Action relates back to *Tripp* merely because the complaints in both cases alleged that Bancorp was headquartered in Pas-

---

[10]  ER:5 (stipulation eliminating "any issues relating to the sufficiency of the notices of circumstances tendered in respect of the Trustee action or whether the Trustee Action is a claim first made after the expiration of the 2008-09 Policies").

[11]  ER:3 (describing the issue in dispute as "whether coverage for the Trustee Action … is precluded under the 2008-09 Policies because [it is a] Claim[] deemed first made prior to the relevant policy period" by virtue of the Interrelated Wrongful Acts Exclusions).  At one point in the district court, the Insurers asserted that some of the Interrelated Wrongful Acts Exclusions are not really exclusions at all, but instead are part of the basic grant of coverage.  That argument is foreclosed by the parties' stipulation, which frames the dispute as whether "coverage … is precluded."  ER:3.  *See Christian Legal Soc'y v. Martinez*, 130 S. Ct. 2971, 2983-84 (2010) (describing the binding effect of formal stipulations reached by the parties).  In any event, the argument is contrary to California law, *see Aydin Corp. v. First State Ins. Co.*, 959 P.2d 1213, 1217 (Cal. 1998) ("it is the function served by policy language, not the location of language in an insurance policy, that is determinative"), and was not accepted by the district court, see ER:14-16 (citing *Aydin* and characterizing each of the Interrelated Wrongful Acts Exclusions as exclusionary).

22

adena, California.  *Compare* ER:536 *with* ER:1016.  Yet both complaints do allege a Pasadena headquarters, making it literally true that the Trustee's complaint "in any way involv[es] … any fact … alleged in [*Tripp*]."  ER:230.

To establish that the Interrelated Wrongful Acts Exclusions are "reasonably susceptible" to a construction under which coverage is available, *see Trident Ctr.*, 847 F.2d at 568-70, the Trustee deposed the insurance professionals who negotiated and administered the 2008-09 Policies.  In the Rule 30(b)(6) deposition of Lloyd's, the primary insurer, its designated representatives testified that in drafting the Interrelated Wrongful Acts Exclusions, "we were looking to exclude any allegation involving the same nature of claims or allegations made in the *Tripp* litigation," ER:1443, and that "anything non-*Tripp* related" would not be excluded, ER:1461.  This testimony is consistent with Lloyd's internal underwriting analysis (used to calculate the premium for the 2008-09 Policies), which stated that the exclusions "ha[ve] the effect of" eliminating coverage for "any new claims that are pleaded on the same grounds as the *Tripp* Litigation."  ER:1469.  Similar testimony was given by other insurer witnesses:

- When asked whether a claim like the Trustee's Judgment would be deemed sufficiently related to an earlier claim to trigger the Interrelated Wrongful Acts Exclusions if "the only overlapping fact" in both is that "IndyMac is a bank," ER:1518, a Lloyd's underwriter responded

23

that the real inquiry is "the sense of materiality. And [the] fact that [IndyMac] was a bank is not necessarily material to this exclusion. So I would suggest that my understanding is, or was I should say, that it was facts that are material … to both complaints," ER:1522.

- XL's representative testified that the exclusions would eliminate coverage for "the *Tripp* litigation and any related claims that come out of the *Tripp* litigation or were related to the *Tripp* litigation." ER:1390-91. When pressed for an explanation of how he understood the term "related," the underwriter responded: "I mean, claims that allege similar wrongful acts to the ones that are stated in the *Tripp* litigation," ER:1392.

- Zurich's representative testified that there is no "hard-and-fast rule as to how much overlap there has to be. You have to … read the pleadings as a whole … and so I don't think you can say that, you know, this many, these many facts need to overlap …. [Y]ou just have to read everything as a whole and make a judgment." ER:1425-26.

To be sure, certain Insurer witnesses gave testimony supporting unprecedentedly broad constructions of the Interrelated Wrongful Acts Exclusions.[12] But

---

[12]  *See, e.g.*, ER:1459-60 (testimony that two claims sharing no more in common than an allegation that Bancorp "is the holding [company] for IndyMac Bank
*(FOOTNOTE CONTINUED)*

even if such constructions were reasonable (they are not), the result would not change:  As between two reasonable interpretations of an exclusion in an insurance policy, courts must adopt the interpretation that results in coverage.  *MacKinnon v. Truck Ins. Exch.*, 73 P.3d 1205, 1218 (Cal. 2003) ("But even if London Market Insurers' interpretation [of the exclusion] is considered reasonable, it would still not prevail, for in order to do so it would have to establish that its interpretation is the **only** reasonable one.").

On cross-motions for summary judgment, the district court held that the Interrelated Wrongful Acts Exclusions eliminate coverage for the Trustee Action because the Trustee Action and *Tripp* each have some remote causal relationship to risky mortgages:  "The risky mortgages put [the Bank] in a difficult financial situation, which [the Former Ds&Os] attempted to fix by allegedly downstreaming funds from Bancorp in violation of their fiduciary duties.  For this reason, the Trustee [Action] directly result[s] from the *Tripp* [Action]."  ER:18.

## SUMMARY OF THE ARGUMENT

The district court erred by construing the Interrelated Wrongful Acts Exclusions to bar coverage if *Tripp* and the Trustee Action "have in common any of the same underlying facts, circumstances, events or series of facts, circumstances,

---

F.S.B. which operates as a hybrid thrift mortgage banker" would be deemed one and the same claim because the Interrelated Wrongful Acts Exclusions are "broad enough … to do so").

events." ER:15.  The operative terms used in the Interrelated Wrongful Acts Exclusions – based on, attributable to, arising out of, resulting from, in consequence of, involving, nexus, and related or interrelated – require a common nexus greater than the sharing of any common fact.  *See* Point I.A.  Rather, the case law uniformly construes interrelated wrongful acts exclusions in order to afford an insured party coverage for independent wrongful acts that cause distinct harms to different parties under different legal theories.  *See* Point I.B.  The district court's contrary conclusion is inconsistent with the claims-made framework of the 2008-09 Policies.  *See* Point I.C.  Accordingly, the decision below must be reversed.

The case must be remanded to the district court with directions to enter judgment in the Trustee's favor for $35 million.  Under well-settled California law, if the Interrelated Wrongful Acts Exclusions are "reasonably susceptible" (either on their face or after consulting extrinsic evidence) to any construction that would result in coverage for the Trustee's Judgment, then the Trustee prevails.  *See* Point II.A.  The Interrelated Wrongful Acts Exclusions are reasonably susceptible to the interpretation favoring coverage proffered by the Trustee and supported by testimony from the Insurers' own witnesses (whose testimony the district court erroneously discounted because they "are not lawyers and thus the relevance of their opinion is questionable at best," ER:15).  *See* Point II.B.

# ARGUMENT

## I.  THE DISTRICT COURT ERRED BY GRANTING THE INSURERS SUMMARY JUDGMENT

### A.  The Lower Court Misconstrued the Interrelated Wrongful Acts Exclusions

The Interrelated Wrongful Acts Exclusions exclude Claims – not facts, circumstances, or events.  And the only Claims that are excluded are those with some necessary and central connection to a prior Claim – *i.e.*, Claims that are "based on" or "attributable to" the wrongful acts that gave rise to a prior Claim; Claims that "arise out of," "result from," or are a "consequence of" such wrongful acts; or Claims that "involve," share a "nexus" with, or are "related" to or "interrelated" with the wrongful acts giving rise to a prior Claim.

Here, there are two pertinent Claims:  *Tripp* and the Trustee Action.  Because those two Claims do not share the requisite necessary or central connection, the Interrelated Wrongful Acts Exclusions do not apply.  *See* Point I.A.1.  The district court inaccurately paraphrased the Interrelated Wrongful Acts Exclusions and then misapplied its garbled version of them.  ER:15, 18.  That approach failed to give effect to the Interrelated Wrongful Acts Exclusions as they were drafted and runs counter to deeply rooted legal principles concerning causation.  *See* Point I.A.2.

27

### 1.    The Language of the Interrelated Wrongful Acts Exclusions

The Interrelated Wrongful Acts Exclusions do not exclude subsequent Claims merely "if they have in common any of the same underlying facts, circumstances, events or series of facts, circumstances, events" as a prior Claim.  ER:15. To the contrary, the Interrelated Wrongful Acts Exclusions describe the required connection between Claims by using the terms "based upon" or "based on," "attributable to,"  "arising out of," "resulting from," "in consequence of," "involve," "nexus," and "related" or "interrelated."[13]  These operative terms, both in common

---

[13]  ER:205, 207, 230, 258, 290, 292, 315, 325, 343, 357.  The Oxford English Dictionary ("OED") <www.oed.com> defines these terms in the following ways consistent with the Trustee's proffered interpretation of the Interrelated Wrongful Acts Exclusions as not encompassing subsequent claims asserted by different parties, for different wrongs, addressing different harms, on the basis of distinct legal principles:

"base" includes to "have as the foundation for (something); use as a point from which (something) can develop."

"attribute" includes "regard something as being caused by (someone or something)."

"arise from/out of" means "occur[ing] as a result of."

"result" means "to occur or follow as the consequence of something."

"consequence" means "[a] thing or circumstance which follows as an effect or result from something preceding."

"involve" includes "To entangle (a matter), to render intricate"; "To envelop within the folds of some condition or circumstance" and "To contain implicitly; to include as a necessary (and therefore unexpressed) feature, circumstance, antecedent condition, or consequence; to imply, entail."

"nexus" includes: "A central point or point of convergence; a focus[.]"

*(FOOTNOTE CONTINUED)*

usage[14] and in the world of litigation and insurance, convey that to be excluded, the subsequent claim must have a ***necessary and central*** connection to the prior claim and not merely an ***incidental or peripheral*** connection or ***any*** connection at all.

The Trustee's asset-stripping claim lacks this essential link to the *Tripp* securities claim. The Trustee Action is not "based on" or "attributable to" *Tripp* because misstatements and omissions in Bancorp's securities filings (the heart of *Tripp*) are not in any sense the foundation or starting point of the Trustee Action. *See supra* note 13. The alleged misstatements and omissions in public filings from late 2006 and early 2007 (the gravamen of *Tripp*) are irrelevant to the Trustee Action, which concerns the Former Ds&Os' decisions in late 2007 and early 2008 to transfer Bancorp's assets beyond the reach of its creditors. Indeed, if every fact the *Tripp* plaintiffs alleged, and every theory they propounded, were accepted by the district court as valid, that would not create or imply liability to the Trustee. *Tripp* is not the foundation or starting point of the Trustee Action.

---

"related" means "Connected or having relation to something else." Although the OED definition of "related" does not specify the degree of relatedness, common legal usage demonstrates that the connection must be substantial to result in legal consequences. For example, the Federal Rules of Civil Procedure set out a standard for when an amended pleading "relates back to" a prior pleading. *See* Fed. R. Civ. P. 15(c)(1)(B) (relation back if the amendment asserts a claim or defense that "arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading.").

[14]  *Scott v. Cont'l Ins. Co.*, 51 Cal. Rptr. 2d 566, 569 (Ct. App. 1996) ("In seeking to ascertain the ordinary sense of words, courts in insurance cases regularly turn to general dictionaries.").

Similarly, the Trustee Action did not "arise out of" or "result[] from" *Tripp*, nor is it a "consequence" of *Tripp*, given the absence of any causal relationship between the two cases. *See supra* note 13. The Former Ds&Os' decision to transfer assets out of Bancorp came after *Tripp* was filed and tendered to the insurers, but that decision is not an effect of *Tripp* and was not made because of *Tripp*. *Cf. James River Ins. Co. v. Kemper Cas. Ins. Co.*, 585 F.3d 382, 386 (7th Cir. 2009) ("Maybe if Columbus hadn't discovered America the federal courts of appeals would not have been created in 1891; but it would be odd to say that the federal appellate judiciary 'arose from' Columbus's voyages.").

Two other operative terms in the Interrelated Wrongful Acts Exclusions – "involve" and "nexus" – also denote a necessary and central connection between the two things being compared. For the Trustee Action to "involve" *Tripp*, the two cases would have to be somehow entangled or one would have to envelop the other. *See supra* note 13. But *Tripp* and the Trustee Action assert independent wrongful acts that caused distinct harms to different parties under different legal theories. Similarly, for *Tripp* and the Trustee Action to share a common "nexus," there would have to be a common central point or point of convergence. *Id*. Again, there is not: the wrongful acts are different, the harms are distinct, the cases involve different parties, and the claims rest on different legal theories.

30

Finally, certain of the Interrelated Wrongful Acts Exclusions use the terms "relate" or "interrelated." ER:205, 207, 258, 290, 343. With one exception, these terms are all used in connection with the defined term "Interrelated Wrongful Acts," which is laden with its own causal language. The one exception is an "Excess Absolute Prior Notice Exclusion" found in one of the policies, which speaks of claims "in any manner related to" each other. ER:258. Even here, however, the term must be read in its ordinary sense, which requires a substantial connection between the two things being compared. *See supra* note 13.

### 2.    The District Court's Recasting of the Exclusions

The words that comprise the Interrelated Wrongful Acts Exclusions matter, and they require something more than what exists here. The district court erred by summarizing and recasting the Interrelated Wrongful Acts Exclusions to reach subsequent Claims that "have in common any of the same underlying facts, circumstances, events or series of facts, circumstances, events" as a prior Claim, ER:15, and then generalizing the Bank's poor underwriting practices for mortgages, ER:18, as a type of root cause underlying both *Tripp* and the Trustee Action.

At best, the district court's generalizations mean that the Claims asserted in the Trustee Action and the Claims in *Tripp* are incidentally or peripherally related to each other in that they concern Bancorp's sole business (being the holding company of the Bank). Any two plaintiffs who sue the same corporate entity will plead

31

some facts in common since both claims involve the same defendant or some of the same fiduciaries (*e.g.*, the Former Ds&Os). No court has held such incidental or peripheral overlap sufficient to preclude coverage under a prior acts exclusion and no insured would reasonably anticipate (or pay for) such illusory coverage. *E.g.*, *Fed. Ins. Co. v. Raytheon Co.*, 426 F.3d 491, 497 (1st Cir. 2005) (declining to adopt "broadest possible construction under which any overlapping fact between the two proceedings – for example the identity of Raytheon as the defendant – would trigger the exclusion"); *Southridge Capital Mgmt., LLC v. Twin City Fire Ins. Co.*, 2006 Conn. Super. LEXIS 2754, at *28 (Sept. 8, 2006) ("The courts recognize that *some* degree of relatedness is going to exist among almost any claims brought against an insured, especially in the field of directors' and officers' liability insurance, and there clearly have to be boundaries of some sort.").

The common background facts cited by the district court – that the Bank underwrote residential mortgages poorly, and that the Bank and Bancorp were in a "difficult financial position" (ER:15) because of that poor underwriting – do not render *Tripp* necessarily or centrally related to the Trustee's asset-stripping claims. Bancorp was the holding company for a bank that specialized in making home mortgage loans. Virtually any claim that Bancorp might face would therefore have some connection to mortgages and banking. The *Tripp* plaintiffs sued Bancorp for making public misstatements or omissions in 2006 and 2007. The misstatements

obviously had to pertain to some material aspect of Bancorp's activities.[15]  Similarly, when the Former Ds&Os moved Bancorp's assets beyond the reach of its creditors, they must have done so for a reason having economic significance to the Bank or Bancorp.  The allegations and wrongs alleged in *Tripp* neither dictated nor had any necessary or central connection with the facts, circumstances, and independent wrongs that underlie the Trustee's Judgment.

The approach adopted by the district court runs counter to deeply rooted legal principles governing causation and proximate cause.  At common law, liability hinges on a sufficiently close connection between wrongful act and resulting harm – *i.e.*, proximate cause.  Proximate cause is "a necessary limitation on liability." *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 838 (1996).  It reflects the recognition that, "'[i]n a philosophical sense, the consequences of an act go forward to eternity, and the causes of an event go back to the dawn of human events, and beyond.'" *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 266 n.10 (1992) (quoting W. KEETON, ET AL., PROSSER & KEETON ON TORTS § 41 at 64 (5th ed. 1984)). Thus it has long been the law in tort that intervening independent wrongs break the causal chain.  PROSSER & KEETON ON TORTS § 44 at 317-18.

---

[15]  *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) (actionable misstatements or omissions under the securities laws require "a substantial likelihood that a reasonable shareholder would consider it important").

In short, giving effect to the plain and natural meaning of the words used in the Interrelated Wrongful Acts Exclusions requires that the factual or legal overlap in question must be substantial, necessary and central.  No such overlap exists in this case.  As Judge Wu (the district judge presiding over *Tripp*) concluded when he declined to accept transfer of the Trustee Action as "related" to *Tripp*, the two cases are based on "totally unrelated" legal theories and share no "substantially related or similar question of law or fact."  ER:1369.

### B.    Controlling Case Law Establishes That the Interrelated Wrongful Acts Exclusions Do Not Apply to Different Legal Claims Brought by Different Parties to Redress Different Injuries

Interrelated wrongful acts exclusions are commonly litigated.  In the dozens of cases allocating claims based on language similar to that in the 2008-09 Policies, notwithstanding the existence of some common facts, ***no*** court has found two claims related when they involve independent wrongful acts, distinct harms, different parties and different legal theories.  The leading Ninth Circuit cases are *Financial Management Advisors, LLC v. American International Specialty Lines Insurance Co.*, 506 F.3d 922 (9th Cir. 2007) ("*FMA*"), and *Eureka Federal Savings & Loan v. American Casualty Co.*, 873 F.2d 229 (9th Cir. 1989).  The leading California case is *Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Insurance Co.*, 855 P.2d 1263 (Cal. 1993).

### 1.    Ninth Circuit Cases – *FMA* and *Eureka*

In *FMA*, the Ninth Circuit made clear that the mere overlap of "any" com-
mon fact between two actions is insufficient to trigger coverage exclusions like the
Interrelated Wrongful Acts Exclusions.   FMA was an investment advisor.   506
F.3d at 923.   Two clients – Sitrick and Steinman – separately sued FMA for mis-
representing the safety of the same type of collateralized bond obligation ("CBO")
investments.   *Id.* at 924-25.   Both Sitrick (who sued in December 2002) and Stein-
man (who sued in September 2004) complained about the conduct of the same
FMA broker.   *Id.*   FMA's insurer argued that the Sitrick and Steinman claims
"were 'related' because both involved material misrepresentations made by the
same financial advisor about the risk of investing in CBO II."   *Id.* at 925.[16]   The
district court agreed, and entered judgment in favor of the insurer.   *Id.*

The Ninth Circuit reversed.   Interpreting the contract under California law,
the court found that, even though the Sitrick and Steinman claims shared a com-
mon legal theory (misrepresentation of the safety of a particular investment) and
shared many of the same common facts (including the identity of the FMA broker
who advised both clients, and some of the same risky investments), such similari-
ties did not mean that the two claims "ar[ose] out of the same or related Wrongful

---

[16]   The policy in *FMA* excluded "any claim arising out of the facts alleged, or aris-
ing out of the same or related Wrongful Acts alleged or contained, in any claim
which has been [previously] reported."   506 F.3d at 924.

Acts." *Id*. at 925. Rather, "Sitrick[] and Steinman were unrelated investors, with unique investment objectives. They were advised at separate meetings on separate dates, according to their unique financial positions." *Id*. "We do not believe the term 'related' was intended to bar recovery whenever two parties are advised to invest in the same fund. Nor are the Sitrick and Steinman Claims logically related simply because both claimants blamed the same financial advisor." *Id*. at 926.

*Eureka* is similarly on-point. There, as here, a bank's poor loan underwriting practices ultimately led to its failure. The bank's insurers contended that poor underwriting generally constituted a single loss under the D&O insurance. 873 F.2d at 234 ("[The insurer] claims that the alleged losses … constitute a single loss under the policy because they resulted from an aggressive lending strategy adopted by Eureka in 1983 to reverse chronic operating losses.").

Interpreting policy language strikingly similar to the Interrelated Wrongful Acts Exclusions at issue here,[17] the Ninth Circuit rejected the insurer's position. Applying California law, the Court held that "the fact that all loan losses arguably originated from one [lending] policy does not require finding only one loss." 873

---

[17] *Compare* 873 F.2d at 234 ("'[c]laims based on or arising out of the same act, interrelated acts, or one or more series of similar acts, of one or more Directors or Officers shall be considered a single loss"), *with* ER:207 (claims "based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving" the same wrongful acts constitute a single loss). Notably, in *Eureka*, the bank had even conceded that the insurer "could prove its theory of a common business plan." 873 F.2d at 234.

F.2d at 234-35. "In this case there were numerous intervening business decisions that took place after the [lending] policy was initiated that required the exercise of independent business judgment." *Id.* at 235. "Thus, the decision to implement the aggressive [lending] policy did not cause the losses, rather it was the alleged negligence on the part of the [bank's officers] in making or approving the individual transactions." *Id.*

*FMA* and *Eureka* control this case. Here, as in *FMA*, "[the Trustee] suffered a loss independent of the loss to the [*Tripp* class], and sued separately for recovery of his separate loss." 506 F.3d at 926. And as in *Eureka*, the 2006-era poor underwriting practices alleged in *Tripp* did not "cause" the Former Ds&Os to transfer Bancorp's assets beyond the reach of its creditors. 873 F.2d at 235. Rather, "it was the alleged [breach of fiduciary duty] on the part of the [Former Ds&Os] in making or approving the [asset-stripping transfers]." *Id.*; *see also Okada v. MGIC Indem. Corp.*, 823 F.2d 276, 283 (9th Cir. 1986) (affirming conclusion that underlying lawsuits alleging several distinct acts involved more than one "loss" notwithstanding their culmination in one result, a bank's failure: "one result does not require finding only one 'loss.'").[18]

---

[18] Similarly instructive is *Eastwood Insurance Services, Inc. v. U.S. Specialty Insurance Co.*, 391 F. App'x 611 (9th Cir. 2010), which concerned two separate claims by a single employee. The first claim (sexual harassment by the employee's supervisor) was made in one policy year; the second claim (firing the

*(FOOTNOTE CONTINUED)*

## 2.   California Law – *Bay Cities* and Progeny

The California courts also refuse to interpret interrelated wrongful act clauses to encompass two claims that share any common fact.  *Bay Cities* is particularly instructive because it shows the type of relatedness necessary to treat a subsequent claim as relating back to a prior one – *i.e.*, that two separate wrongful acts were one and the same "claim" by virtue of a policy provision providing that "[t]wo or more claims arising out of a single act, error or omission or a series of related acts, errors or omissions shall be treated as a single claim."  855 P.2d at 1265.

*Bay Cities* concerned a general contractor's claim against its attorney for legal malpractice in failing to take the legal steps required to recover money owed to the contractor.  The attorney properly "recorded a mechanic's lien but thereafter [1] failed to serve a stop notice on the project's construction lenders and [2] failed to file a complaint to foreclose the mechanic's lien."  *Id*. at 1264.  Because of the attorney's failures, the debt was never collected.  *Id*.

---

employee while she was on leave for depression following the sexual harassment) was made in the following policy year.  *Id*. at 612.  In a coverage action challenging denial of the second claim, the district court granted summary judgment to the insurer, ruling that the two claims were "interrelated."  *Id*. at 612-13.  This Court reversed:  "These claims … arose from different facts and circumstances" and "were completely separate and distinct," *id*. at 613, even though the concerned the same employment relationship and (at least tangentially) could both be traced to the unlawful sexual harassment.

The dispositive issue before the California Supreme Court was whether the negligent attorney's two separate failings should be deemed one and the same claim. The lower courts reasoned that each of the separate failings constituted a "distinct cause[] of action," and thus could not be deemed one and the same claim. *Id*. at 1265. The California Supreme Court disagreed and reversed: "[The contractor] had a single right – the right to payment for its construction. The loss of that right as a result of the attorney's two omissions resulted in a single injury." *Id*. at 1266. Put differently, when "a *single* client seeks to recover from a *single* attorney alleged damages based on a *single* debt collection matter for which the attorney was retained," then there is only "a *single* claim under the attorney's professional liability insurance policy." *Id*.

As applied to the facts here, the reasoning of *Bay Cities* requires reversal of the district court. The *Tripp* plaintiffs and the Trustee are completely different claimants. They brought suit to recover completely different damages on account of completely different wrongs. As *Bay Cities* observed, "[a]t some point, a relationship between two claims, though perhaps 'logical,' might be so attenuated or unusual that an objectively reasonable insured could not have expected they would be treated as a single claim under the policy." *Id*. at 1275. *See also id*. at 1276

39

(Kennard, J., concurring) (discussing the need "to impose some limiting construction on the policy term 'related acts or omissions'").[19]

California's intermediate appellate courts have applied *Bay Cities* in two instructive cases, *Feldman v. Illinois Union Insurance Co.*, 130 Cal. Rptr. 3d 770

---

[19] Ignoring the substantial case law discussed in the text dealing with interrelated wrongful acts exclusions in claims-made liability policies, the district court instead relied on a general statement in a single California Court of Appeal decision concerning the meaning of the term "arising out of." ER:15 (citing *Medill v. Westport Ins. Co.*, 49 Cal. Rptr. 3d 570, 578-79 (Ct. App. 2006)). The insured in *Medill* sought coverage for losses arising out of a breach of contract, even though breach of contract claims were specifically excluded from coverage. It was therefore important that the acts for which coverage was sought were "not independent of the breach of contract claims." 49 Cal. Rptr. 3d at 580 ("No aspect of the underlying bond litigation would exist without the alleged breaches of the loan agreements and indentures and the contractual obligations to pay on the bonds."). The exclusion applied because the connection was not incidental and the suit was not based on an independent wrong. *Medill* distinguished a case construing similar language, *Church Mutual Insurance Co. v. U.S. Liability Insurance Co.*, 347 F. Supp. 2d 880 (S.D. Cal. 2004), in which the court rejected the insurer's argument that no more than an incidental connection between breach of contract and fraud was required given the "arising out of" language in the policy. *Medill*, like *Church Mutual*, required the insurer before it to show more than an incidental connection. The district court's citation of *Medill* is inapposite and its quotation out of context. In framing its discussion, *Medill* did state that the term arising out of "'connotes only a minimal causal connection or incidental relationship.'" *Medill*, 49 Cal. Rptr. 3d at 578-79 (quoting *Acceptance Ins. Co. v. Syufy Enters.*, 81 Cal. Rptr. 2d 557, 561 (Ct. App. 1999)). But, critically, *Acceptance* involved an insured asserting coverage, not an insurer seeking to deny coverage, on the basis of that language. *Medill*, like all the California authorities, required more than an incidental connection to support a denial of coverage on the basis of policy provisions such as these, and it expressly distinguished *Church Mutual* on this ground. *Medill* cannot be fairly read, as the district court read it, to support the position that an incidental connection between subsequent and prior act is a sufficient basis for the denial of coverage on the basis of an interrelated wrongful acts exclusion.

(Ct. App. 2011), and *Friedman Professional Management Co. v. Norcal Mutual Insurance Co.*, 15 Cal. Rptr. 3d 359 (Ct. App. 2004). Both cases require, at a minimum, a substantial nexus – not a remote common cause or "any" common fact – to relate two claims to each other for coverage purposes.

*Feldman* concerned an original breach of contract and successor liability complaint against a manufacturer that was later amended by the plaintiff creditor to allege "alter ego" liability on the part of certain new defendants. 130 Cal. Rptr. 3d at 775-76. The question was whether the original complaint and the amended complaint constituted "Interrelated Wrongful Acts" under an insurance policy such that they were to be deemed a single claim. Rejecting the argument that the amended complaint constituted a new claim because it fleshed out "many new details" of the pertinent events, the *Feldman* court observed that "these details all pertained to the alleged fraudulent assignment and transfer of [assets], made with the intent (and effect) of avoiding the former company's [obligation to its creditors]." *Id*. at 776. In other words, in both the original and amended complaints, the identity of the injured party, the harm and the wrongful acts alleged were the same.[20]

---

[20] The policy in *Feldman* defined "Interrelated Wrongful Acts" as "more than one Wrongful Act which have as a common nexus any fact, circumstance, situation, event or transaction or series of facts, circumstances, situations, events or transactions." 130 Cal. Rptr. 3d at 775. *Cf.* ER:76 (defining the same term to mean

*(FOOTNOTE CONTINUED)*

Similarly, *Friedman* concerned a single surgery that went terribly wrong, leading the patient to sue the doctor once in 1994 for malpractice and then again in 1996 for battery. 15 Cal. Rptr. 3d at 361. Because "[t]he malpractice and batteries were literally part of the same series of interconnected events that took place in the surgery room on a particular day in May 1993," *id*. at 366, the court ruled that both claims constituted a "single act or omission or *series of related acts* or omissions involving direct patient treatment." *Id*. at 365; s*ee also id*. at 370 ("It is hard to imagine separate acts which are more clearly causally related.")

The district court's reasoning below is contrary to both *Feldman* and *Friedman*, as well as *Bay Cities*. The Trustee Action did not flesh out any "new details" of the same basic operative facts of *Tripp*. *See Feldman*, 130 Cal. Rptr. 3d at 776-77. Rather, the Trustee Action was an entirely separate claim brought by an entirely separate party under wholly different legal theories to redress entirely independent wrongful acts. Similarly, the wrongful acts alleged in the Trustee Action and *Tripp* are not "literally part of the same series of interconnected events that took place" at or about the same place and time. *Friedman*, 15 Cal. Rptr. 3d at 361.[21]

---

"Wrongful Acts which have as a common nexus any fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events or transactions").

[21] In their briefing below, the Insurers relied on *ML Direct, Inc. v. TIG Specialty Insurance Co.*, 93 Cal. Rptr. 2d 846 (Ct. App. 2000), which dealt with a subsequent class action suit predicated on securities law violations involving improp-

*(FOOTNOTE CONTINUED)*

### 3.    Additional Authorities

These Ninth Circuit and California authorities are consistent with the case law from other jurisdictions addressing interrelated wrongful acts exclusions. Courts across the nation have interpreted similar exclusions consistent with this precedent:

- In *Ryan v. National Union Fire Insurance Co.*, 692 F.3d 162 (2d Cir. 2012), the Second Circuit held that a securities broker's wrongful act of "churning" a client's account to generate commissions did not relate back to the wrongful act of directing that same client to sign a power of attorney and to give the broker discretionary control over the account. *Id.* at 168.

- In *Federal Deposit Insurance Corp. v. Mmahat*, 907 F.2d 546 (5th Cir. 1990), the Fifth Circuit held that an attorney's three distinct acts of malpractice and breach of fiduciary duty were not "related acts"

---

er underwriting, market manipulation and "boiler room" sales practices involving the sale of ML Direct stock. The prior actions at issue were administrative proceedings brought by the National Association of Securities Dealers and the United States Securities and Exchange Commission (SEC) against a third party in which these practices were first publicly disclosed. *Id.* at 851. The SEC complaint specifically referenced the existence of these practices in connection with sale of ML Direct stock. In such a case it is again unsurprising that a subsequent class action based on the *same wrongful acts* that were already the subject of pending administrative action in the prior policy period was deemed to relate back for coverage purposes. *Id.* at 853.

even though they were motivated by the same end, which was "generat[ing] fees for his firm." *Id*. at 553-54.

• In *ACE American Insurance Co. v. Ascend One Corp.*, 570 F. Supp. 2d 789 (D. Md. 2008), a Maryland court ruled that a suit by four individuals enrolled in the policyholder's debt management plan was not interrelated with a state consumer protection investigation into debt management plans generally. The two matters were "different in scope and time," with the state agency undertaking a broad investigation of the policyholder's practices generally "rather than focusing on the specific experiences of the [four civil] plaintiffs." *Id*. at 800-01.

• In *Federal Savings & Loan Insurance Corp. v. Burdette*, 718 F. Supp. 649 (E.D. Tenn. 1989), the insurer argued that twenty-five negligently made loans "represent a single continuing failure by the officers and directors to carry out their duties due to a single scheme carried out by [two bank officials], therefore, there is only a single loss." *Id*. at 658. After carefully examining the case law (including this Court's decisions in *Eureka* and *Okada*), the district court rejected that argument: "[E]ach loan or participation involved separate and different collateral, each loan … occurred at a different time [and] for a different purpose," with "different deficiencies." *Id*. at 660.

44

- Similarly, in *North River Insurance Co. v. Huff*, 628 F. Supp. 1129 (D. Kan. 1985), a district court held that making and approving separate loans constituted distinct claims (and were not "interrelated"), even though they were all were part of same "loan swap program." *Id*. at 1133-34.

- In *Allmerica Financial Corp. v. Certain Underwriters at Lloyd's, London*, 871 N.E.2d 418 (Mass. 2007), the court ruled that two lawsuits brought by different plaintiffs against the same insurance company were not "interrelated" because first lawsuit alleged misrepresentations by a particular agent and negligent failure to supervise by the company, whereas the second suit alleged a scheme of misrepresentations perpetrated by the company through its agents. *Id*. at 430.

In sum, while there may be some uncertainty around the margins concerning the proper scope of interrelated wrongful acts exclusions, ***no*** court has found that claims brought by different parties to redress different injuries on account of different wrongful acts under different bodies of law are related for coverage purposes under claims-made polices. The district court parted company with relevant legal authority when it found that the existence of unsound home mortgage underwriting practices at the Bank meant that the shareholder securities fraud claim in

45

*Tripp* and the Trustee's asset-stripping claim were sufficiently related that both together constituted a single Claim allocable to the prior year's claims-made policy.

**C.    The Interrelated Wrongful Acts Exclusions Must be Construed Consistently With the Basic Purpose of Claims-Made Insurance Policies to Afford Coverage for Claims First Asserted in the Policy Period**

The reasoning and results reached by the authorities discussed above derive from the very nature of claims-made insurance policies. "'Claims made' policies exist to confine coverage to claims made during the policy period." *Homestead Ins. Co. v. Am. Empire Surplus Lines Ins. Co.*, 52 Cal. Rptr. 2d 268, 273 (Ct. App. 1996). Misallocation of claims "would contradict the purpose of claims made policies" and "impair the well documented 'social utility' of these policies." *Id.*

Since the early 1980s, as litigation against corporate officials has increased, claims-made insurance has been the standard product in the market for D&O insurance. William A. Hancock, *D&O Liability Ins. Seminar*, 5 CORP. COUNSEL'S Q. 117, 118 (1989). Among the advantages of such policies over the occurrence-based liability insurance that was traditionally available, claims-made policies provide both insurers and insureds with greater certainty. 4 NEW APPLEMAN ON INSURANCE § 26.02 at 26-10, -11 (2012). At the close of a policy year, all insured liabilities are known and can be properly reserved for. Liabilities that are closely connected to prior acts are covered in the year the claim is made or notice of the prior acts is given. *See, e.g.*, *Merrill & Seeley v. Admiral Ins. Co.*, 275 Cal. Rptr.

280, 282 (Ct. App. 1990).  As a consequence, the pricing of claims-made policies is more certain and therefore more efficient.  Policy limits can be negotiated with reference to risks closer in time to when they mature and therefore based on a more accurate assessment of the risk based on current market conditions.  *Montrose Chem. Corp. v. Admiral Ins. Co.*, 913 P.2d 878, 903-04 (Cal. 1995).

Critically, the advantages of a claims-made policy depend upon properly allocating a claim to the policy year in which the claim is made and notice given.  Interpreting interrelated wrongful acts exclusions broadly to deny retroactive effect to a claims-made policy is inconsistent with the fundamental nature of the claims-made bargain.  *Sparks v. St. Paul Ins. Co.*, 495 A.2d 406, 415 (N.J. 1985) ("A leading proponent of 'claims made' coverage has characterized this *quid pro quo* – the relinquishment of prospective coverage in return for retroactive coverage – as '***the essential*** trade-off inherent in the concept of 'claims-made' insurance.'" (citation omitted) (emphasis in *Sparks*)).  Thus, a "'claims made' policy that affords no retroactive coverage whatsoever during its initial year of issuance does not accord with the objectively reasonable expectations of the purchasers of professional liability insurance." *Id*.

Interrelated wrongful acts exclusions undoubtedly have their place in a claims-made regime.  Subsequent events, like amendments or joinders or interrelated wrongs growing out of the initial claim, may be part of that same unit of liti-

gation and properly allocated to the year in which that claim was first reported. *Bay Cities*, 855 P.2d at 1275. In this respect, as at least one California case has explained, interrelated wrongful acts exclusions (properly construed) are similar in function to the traditional rules of *res judicata*. *See Friedman*, 15 Cal. Rptr. at 365-68. That is, courts often look to whether the nucleus of operative facts and underlying transactions are the same to determine whether a claim is related to a prior claim for purposes of exclusion from coverage.[22]

Here, a securities fraud judgment in favor of the *Tripp* class would not bar the Trustee from asserting his asset-stripping claim. These two matters are not the same transaction, do not grow out of a common nucleus of operative fact and do not constitute a related series of events conveniently tried together as one unit of litigation. *See generally Int'l Union of Operating Eng'rs Trust Funds v. Karr*, 994 F.2d 1426, 1429 (9th Cir. 1993). Indeed, these matters are so far from being one unit of litigation that even as they were being concurrently litigated, the district court did not consider them related matters for purposes of consolidation, assignment and case administration. ER:1369 (declining to accept transfer of the Trustee

---

[22] *See, e.g.*, *FMA*, 506 F.3d at 925-26 (claimants were unrelated investors with unique investment objectives, advised in separate meetings on separate dates according to their unique financial positions); *Okada*, 823 F.2d at 283 (claims were for separate losses based on different negligent acts by directors and officers including the modification of a certain condominium loan, a spot lending policy, and the decision to renovate and move the corporate headquarters).

48

Action as "related" to *Tripp*, because the Trustee Action is "based on legal theories totally unrelated to any securities violation claims").

An overbroad construction of a prior acts exclusion in the subsequent year policy would allocate the liability to the prior year policy even though the claim is not made on, and could not reasonably have been anticipated and reserved for by, the prior year insurer. *Homestead*, 52 Cal. Rptr. 2d at 273. This misallocation not only would disadvantage the insured by denying it access to subsequent year policy limits for which it has paid, it also would allow the subsequent year insurer to improperly throw off liability onto the prior year insurer.[23]

There are always some common facts between two claims against the same insured arising out of that insured's business operations – as this case illustrates. The district court ruled that the Interrelated Wrongful Acts Exclusions apply to bar any claim traceable to the Bank's unsound mortgage underwriting practices. But neither *Tripp* nor the Trustee Action sought redress for unsound underwriting. The Tripp plaintiffs sued because they paid too much for Bancorp's stock. Had proper disclosures been made, they would have paid a price that reflected the market's assessment of its true value at the time. The Trustee sued because the Former Ds&Os transferred $355 million of Bancorp's assets beyond the reach of Ban-

---

[23] The only reason the 2007-08 insurers are not complaining here is that (but for one insurer) they are the same entities that issued the subsequent year claims-made insurance – and the 2007-08 Policies are now exhausted.

corp's creditors shortly before bankruptcy. Had these transfers not been made, an additional $355 million would be available to satisfy the claims of Bancorp's creditors. By applying the Interrelated Wrongful Acts Exclusions to equate two fundamentally different types of claims, the district court vitiated $80 million in otherwise-available coverage under the 2008-09 Policies.

## II.    THE TRUSTEE IS ENTITLED TO SUMMARY JUDGMENT FOR $35 MILLION

The Trustee holds a final Judgment that is due and payable unless barred by the Interrelated Wrongful Acts Exclusions.[24]   As set out above, the Interrelated Wrongful Acts Exclusions (properly construed) do not bar coverage for the Trustee's $35 million Judgment.   Accordingly, in addition to reversing the district court's contrary conclusion, this Court should remand with instructions to enter judgment for $35 million in favor of the Trustee and against the Insurers.

No further proceedings in the district court are necessary.   Under well-settled California law governing the interpretation of insurance contracts, judgment

---

[24] ER:1-9. Other appellants in the consolidated appeals are differently situated in this respect and their coverage claims against the Insurers may in some cases be subject to further defenses. In the Trustee's case, however, the parties' stipulation (approved by the district court) provides that if the Trustee prevails on the scope of the Interrelated Wrongful Acts Exclusions, "he will be awarded $35 million," so long as the 2008-09 Policies have not been "otherwise validly exhausted from the payment of Loss." ER:6. As a result of the ruling below, there have been no payments of Loss from the 2008-09 Policies, and the Trustee is therefore first in line for payment.

50

in the Trustee's favor is required so long as there is a reasonable construction of the Interrelated Wrongful Acts Exclusions by which coverage for the Judgment exists – even if there could be other constructions that are also reasonable. *See* Point II.A. The Trustee's interpretation of the Interrelated Wrongful Acts Exclusions – that they eliminate coverage only for those subsequent Claims that have a necessary or central connection to a prior Claim, rather than subsuming independent wrongful acts that harm different parties in different ways and violate different laws – is a reasonable construction, as evidenced by testimony of the very witnesses who negotiated and applied the exclusions. *See* Point II.B.

### A.    Where Policy Language is Reasonably Susceptible to an Interpretation Affording Coverage, It Must Be So Construed

California law is highly protective of policyholders' reasonable expectations. Policy provisions granting coverage are construed "broadly so as to afford the greatest possible protection to the insured." *MacKinnon,* 73 P.3d at 1213 (internal quotation marks and citation omitted). But "an entirely different rule of construction applies to exclusionary clauses as distinguished from coverage clauses." *State Farm Mut. Auto. Ins. Co. v. Partridge*, 514 P.2d 123, 128 (Cal. 1973) ("*Partridge*"). Exclusions are "interpreted narrowly against the insurer." *Id.* Thus, in *Partridge*, the court held that a single accident involving the discharge of a firearm from a moving vehicle was covered under both an automobile insurance policy covering injuries "arising out of" the use of an automobile, and a homeowners pol-

51

icy using substantially similar language to *exclude* such injuries.  *Id*. at 128-29.

That is, nearly identical language was broadly construed under a granting provision

but narrowly construed under the exclusion.  *Id*. at 128[25]

In addition to this broad coverage / narrow exclusion principle, the Califor-

nia Supreme Court has "declared time and again" that an exclusion "'must be so

stated as clearly to apprise the insured of its effect.'"  *MacKinnon,* 73 P.3d at 1213

(quoting *State Farm Mut. Auto Ins. Co. v. Jacober*, 514 P.2d 953, 958 (Cal. 1973)).

---

[25] In *Continental Casualty Co. v. Richmond*, 763 F.2d 1076 (9th Cir. 1985) ("*Richmond*"), the Court read the phrase "arising out of" in an exclusionary clause covering death and bodily injury so as to preclude coverage for claims of discrimination based on an alleged pattern and practice of police brutality and excessive force against black citizens by the Richmond police.  The City of Richmond sought coverage for the claims of the heirs of a prisoner that died in police custody.  Although the city did not dispute that the wrongful death claim fell within the policy exclusion, the city contended that the heirs' civil rights claims based on discrimination did not fall within the exclusion because the underlying events predated the prisoner's death.  The Court disagreed, finding that "the heirs' pattern and practice claim is related more than just incidentally to the [decedent's] injuries.  Had the alleged pattern and practice of discrimination not manifested itself in the injury to [the prisoner], the heirs would have no claim for relief against the City."  *Id*. at 1081.  *Richmond* cannot fairly be read to require that the phrase "arising out of" must be read broadly in every exclusion and under all circumstances.  *See, e.g.*, *Tower Ins. Co. v. Capurro Enters., Inc.*, 2012 U.S. Dist. LEXIS 46443, at *22-33 (N.D. Cal. April 2, 2012) (distinguishing *Richmond*; construing exclusionary clause narrowly); *Partridge*, 514 P.2d at 128; *Charles E. Thomas Co. v. Transamerica Ins. Grp.*, 72 Cal. Rptr. 2d 577, 580 (Ct. App. 1998) (rejecting broad construction of "arising out of" in policy exclusion; rejecting applicability of case authorities supporting a broad construction of that phrase in the context of coverage clauses).  In *Richmond*, the harm for which coverage was sought was wrongful death, the very kind of harm excluded from coverage by the policy.  As noted supra in Part I.A.1, in this case, *Tripp* and the Trustee Action involve entirely distinct harms.

Only "conspicuous, plain and clear" exclusions are enforceable. *Id.* (quoting *Jacober*, 514 P.3d at 954). This principle is related to the general rule that ambiguous language is construed in the insured's favor. *Safeco Ins. Co. of Am. v. Robert S.*, 28 P.3d 889, 893 (Cal. 2001) ("*Robert S.*"). "Ambiguity" in this context does not mean that the policy language is unintelligible or indecipherable. Rather, the key question is whether the language is "fairly susceptible of either one of the two interpretations contended." *PG&E*, 442 P.2d at 646; *see also MacKinnon*, 73 P.3d at 1213 ("A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable."); *Robert S.*, 28 P.3d at 893 (same).

Applying these interpretative rules in the specific context of insurance policy exclusions, the California Supreme Court has repeatedly held that an insurer's interpretation of a policy exclusion will prevail only if it is the *only* reasonable interpretation. *MacKinnon*, 73 P.3d at 1218 ("But even if London Market Insurers' interpretation [of the exclusion] is considered reasonable, it would still not prevail, for in order to do so it would have to establish that its interpretation is the *only* reasonable one."); *Jacober*, 514 P.2d at 954 ("[W]e have no occasion to determine which of the various proposed interpretations of the clause is the 'correct' one, for under settled principles so long as coverage is available under any reasonable interpretation of an ambiguous [exclusion], the insurer cannot escape liability.")

**B.    The Interrelated Wrongful Acts Exclusions Are Reasonably Susceptible to the Trustee's Proffered Interpretation**

In the proceedings below, the Trustee deposed the individuals who negotiated and administered the Interrelated Wrongful Acts Exclusions. This testimony demonstrates that the district court's expansive interpretation of the Interrelated Wrongful Acts Exclusions is not the only reasonable interpretation. Yet the district court ignored this evidence, reasoning that because these Insurer representatives "are not lawyers," the "relevance of their opinion is questionable at best." ER:15. This conclusion is contrary to well-settled law and common sense.

Under California law, "the intention of the parties as expressed in the contract is the source of contractual rights and duties." *PG&E*, 442 P.2d at 644. Accordingly, extrinsic evidence of the parties' intent is admissible to prove the meaning of a contract where "the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." *Id.* This rule applies even where the contract "appears unambiguous on its face." *Dore v. Arnold Worldwide, Inc.*, 139 P.3d 56, 60 (Cal. 2006) (internal quotation marks and citation omitted).

The testimony of the Insurers' own employees eviscerates the district court's conclusion that the Interrelated Wrongful Acts Exclusions "unambiguously" have the expansive meaning it attributed to them — a meaning that relates virtually ***any*** subsequent claim that could be imagined back to *Tripp*. Although articulated in

54

different ways, these witnesses proffered interpretations of the Interrelated Wrongful Acts Exclusions that result in coverage for the Trustee's Judgment. For example, a Lloyd's representative testified that the Interrelated Wrongful Acts Exclusions "exclude any allegation involving the same nature of claims or allegations made in the *Tripp* litigation." ER:1443. Another Lloyd's employee responded that the test for determining whether two claims are one and the same for purposes of the Interrelated Wrongful Acts Exclusions is "the sense of materiality…. So I would suggest that my understanding is, or was I should say, that it was facts that are material … to both complaints." ER:1522. An internal Lloyd's underwriting analysis (by which Lloyd's calculated the premium to be charged) explained that the Interrelated Wrongful Acts Exclusions stated that the exclusions apply only to "any new claims that are pleaded on the same grounds as the *Tripp* Litigation." ER:1469. Moreover, XL's representative interpreted the exclusions to bar coverage for claims that were "related" to the *Tripp* action, which, as he understood it, meant "claims that allege similar wrongful acts to the ones that are stated in the *Tripp* litigation." ER:1392.

These interpretations all require a substantially tighter connection between the two underlying actions than does the broad interpretation adopted below, under which the Interrelated Wrongful Acts Exclusions bar coverage so long as there exists a mere incidental overlapping fact between the two actions. Thus, the district

55

court's expansive interpretation of the Interrelated Wrongful Acts Exclusions to exclude claims sharing any common fact with *Tripp* is certainly not the *only* reasonable interpretation.  The district court refused to consider this testimony on the ground that the underwriters "are not lawyers."  ER:15.  Unsurprisingly, the district court cited no authority for this novel rule of contract construction.  In fact, the case law requires courts to "interpret[] the policy as read and understood by a reasonable *lay person*."  *Nat'l Auto & Cas. Ins. Co. v. Stewart*, 272 Cal. Rptr. 625, 629 (Ct. App. 1990) (emphasis added); *see also Reserve Ins. Co. v. Pisciotta*, 640 P.2d 764, 767 (Cal. 1982) ("Words used in an insurance policy are to be interpreted according to the plain meaning which a *layman* would ordinarily attach to them." (emphasis added)).  Therefore, a lawyer's opinion concerning the meaning of ambiguous policy language is not only not required, but is, at best, only indirect evidence of the proper interpretation of the policy.  Lay testimony concerning the actual understanding of the parties, however, is direct evidence of an ambiguous policy's meaning.

The district court's failure to consider this evidence is error.  *Morey v. Vannucci*, 75 Cal. Rptr. 2d 573, 579 (Ct. App. 1998) ("Where the meaning of the words used in a contract is disputed, the trial court **must** provisionally receive any proffered extrinsic evidence which is relevant to show whether the contract is reasonably susceptible of a particular meaning.…  Indeed, it is reversible error for a

56

trial court to refuse to consider such extrinsic evidence on the basis of the trial court's own conclusion that the language of the contract appears to be clear and unambiguous on its face." (emphasis added)).  In the context of this coverage dispute, this evidence not only merited consideration, it established as a matter of law that the Interrelated Wrongful Acts Exclusions are reasonably susceptible to the Trustee's proffered interpretation in favor of coverage of the Judgment.  Under California law, even if this were not the *only* reasonable interpretation of the 2008-09 Policies, the fact that the 2008-09 Policies are reasonably susceptible to a construction favoring coverage means the Trustee must prevail.

## CONCLUSION

The Trustee respectfully requests that this Court reverse the judgment below and remand this case to the district court with instructions to enter judgment in favor of the Trustee for $35 million.


Dated:  April 22, 2013              KLEE, TUCHIN, BOGDANOFF & STERN LLP
                                                        *and*
                                        JENNER & BLOCK LLP
                                                        *and*
                                        BUCKLEYSANDLER LLP


                          By:_____*/s/ Robert J. Pfister*_____
                                Robert J. Pfister of Klee, Tuchin, Bogdanoff &
                                Stern LLP, one of the attorneys for appellant
                                Alfred H. Siegel, chapter 7 trustee

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 28(a)(11), I certify that this brief contains 13,974 words, which meets the type-volume limitation stated in Federal Rule of Appellate Procedure 32(a)(7).

Dated:  April 22, 2013

KLEE, TUCHIN, BOGDANOFF & STERN LLP
*and*
JENNER & BLOCK LLP
*and*
BUCKLEYSANDLER LLP


By: _____ */s/ Robert J. Pfister* _____
Robert J. Pfister of Klee, Tuchin, Bogdanoff & Stern LLP, one of the attorneys for appellant Alfred H. Siegel, chapter 7 trustee

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, the Trustee is not aware of any related cases pending in this Court other than those appeals (Nos. 12-56296, 12-56311, 12-56337, 12-56347, and 12-56350) already listed as member cases to this lead case (No. 12-56275).[26]

Dated:  April 22, 2013            KLEE, TUCHIN, BOGDANOFF & STERN LLP
                                 *and*
                                 JENNER & BLOCK LLP
                                 *and*
                                 BUCKLEYSANDLER LLP


                        By:_____*/s/ Robert J. Pfister*_____
                            Robert J. Pfister of Klee, Tuchin, Bogdanoff &
                            Stern LLP, one of the attorneys for appellant
                            Alfred H. Siegel, chapter 7 trustee

---

[26]  The Trustee is party to *Federal Deposit Insurance Corporation v. Siegel* (*In re IndyMac Bancorp, Inc.*), Case No. 12-56218 (9th Cir.), but that is an appeal of a judgment entered in a different district court case and it concerns entirely different issues (specifically, the ownership of certain tax refunds).