Case No. 12-56275

**(Consolidated with Case Nos. 12-56337, 12-56296, 12-56311, 12-56347 & 12-56350)**

𝕴𝖓 𝖙𝖍𝖊 𝖀𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘
𝖋𝖔𝖗 𝖙𝖍𝖊 𝕹𝖎𝖓𝖙𝖍 𝕮𝖎𝖗𝖈𝖚𝖎𝖙

---

XL Specialty Insurance Company, et al.,
Appellees,

v.

Michael W. Perry, et al.,
Appellants.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE CENTRAL DISTRICT OF CALIFORNIA, NO. 2:11-CV-02078
HON. R. GARY KLAUSNER, PRESIDING

---

**BRIEF FOR APPELLANT FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER FOR INDYMAC BANK F.S.B.**

---

COLLEEN J. BOLES
Assistant General Counsel
LAWRENCE H. RICHMOND
Senior Counsel
JACLYN C. TANER
Counsel
FEDERAL DEPOSIT INSURANCE
CORPORATION
3501 Fairfax Drive, VS-D7006
Arlington, VA 22226-3500
Telephone: (703) 562-2373
Facsimile: (703) 562-2496

THOMAS D. LONG
DAVID GRAELER
DAVID J. FARKAS
JENNIFER L. MEEKER
NOSSAMAN LLP
777 S. Figueroa Street
34th Floor
Los Angeles, California 90017
Telephone: (213) 612-7800
Facsimile: (213) 612-7801

*Attorneys for Appellant Federal Deposit Insurance Corporation as Receiver
for IndyMac Bank, F.S.B.*

# TABLE OF CONTENTS

page

TABLE OF CONTENTS .................................................................... i

TABLE OF AUTHORITIES ............................................................. iii

JURISDICTIONAL STATEMENT .................................................... 1

ISSUE PRESENTED ....................................................................... 1

STATEMENT OF THE CASE .......................................................... 2

    I.    NATURE OF THE CASE ...................................................... 2

    II.   PROCEEDINGS BELOW. ..................................................... 4

STATEMENT OF FACTS ................................................................ 6

    I.    INDYMAC'S D&O INSURANCE POLICIES. ....................... 6

    II.   THE *TRIPP LITIGATION*. .................................................. 9

    III.  THE FDIC'S CLAIMS. ........................................................ 11

    IV.  THE *HBD ACTION*. ......................................................... 12

    V.   THE DISTRICT COURT'S JUNE 27, 2012 ORDER. ............. 15

SUMMARY OF ARGUMENT ....................................................... 16

ARGUMENT ................................................................................ 19

    I.    STANDARD OF REVIEW .................................................. 19

    II.   THE DISTRICT COURT ERRED IN GRANTING THE INSURERS'
          MOTIONS FOR SUMMARY JUDGMENT AND DENYING THE
          POLICYHOLDER DEFENDANTS' MOTIONS FOR SUMMARY
          JUDGMENT. ..................................................................... 20

        A.   California Law Construes Policy Exclusions Narrowly. ................... 20

        B.   The *Tripp Litigation* and the *HBD Action* are Not Sufficiently
           "Related" to Constitute a Single Claim as a Matter of Law. ............. 23

           1.   Controlling Ninth Circuit Authority Precludes Treating *Tripp* and
               *HBD* as a Single Claim. .................................................. 25

           2.   Under Controlling California Authority, the Relationship between
               the Claims Asserted in *Tripp* and the Claims in *HBD* is Too
               Attenuated to Constitute a Single Claim. ........................... 32

CONCLUSION .................................................................................. 36

STATEMENT OF RELATED CASES ................................................ 38

RULE 32(a)(7)(C) CERTIFICATE OF COMPLIANCE ...................... 39

CERTIFICATE OF SERVICE .......................................................... 41

ADDENDUM A.............................................................................. 43

ADDENDUM B............................................................................... 46

ADDENDUM C............................................................................... 48

# TABLE OF AUTHORITIES

page

## Cases

*AIU Ins. Co. v. Super. Ct.,*
  51 Cal. 3d 807, 822, 274 Cal. Rptr. 820, 99 P.2d 1253 (1990) ........................... 21

*Bank of the West v. Super. Ct.,*
  2 Cal. 4th 1254, 1264, 10 Cal. Rptr. 2d 538, 833 P.2d 545 (1992) ............... 20, 21

*Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.,*
  5 Cal. 4th 854, 873, 855 P.2d 1263, 21 Cal. Rptr. 2d 691 (1993) ..... 18, 22, 32, 33

*Bennett v. Medtronic, Inc.,*
  285 F.3d 801 (9th Cir. 2002) ............................................................. 14

*Bodell v. Walbrook Ins. Co.,*
  119 F.3d 1411 (9th Cir. 1997) ............................................................. 20

*Charles E. Thomas Co. v. Transamerica Ins. Group,*
  62 Cal. App. 4th 379, 383–384, 72 Cal. Rptr. 2d 577 (1998) ............................ 36

*Crowley v. Nevada,*
  678 F.3d 730 (9th Cir. 2012) ............................................................. 19

*Delgado v. Heritage Life Ins. Co.,*
  157 Cal. App. 3d 262, 271, 203 Cal. Rptr. 672 (1984) ....................................... 21

*E.M.M.I. Inc. v. Zurich Am. Inc. Co.,*
  32 Cal. 4th 465, 471, 9 Cal. Rptr. 3d 701, 84 P.3d 385 (2004) .......................... 22

*Endurance Am. Specialty Ins. Co. v. WFP Sec. Corp.,*
  11-cv-2611 JAH (KSC), 2012 U.S. Dist. LEXIS 153864 (S.D. Cal. September 28, 2012) ......................................................................................... 29

*Eureka Fed. Sav. and Loan Ass'n v. Am. Cas. Co. of Reading, Pa.,*
  873 F.2d 229 (9th Cir. 1989) ................................................... 17, 26, 31

*Ferguson v. Coregis Ins. Co.,*
  527 F.3d 930 (9th Cir. 2008) ............................................................. 19

*Fin. Mgmt. Advisors, LLC v. Am. Int'l Specialty Lines Ins. Co.,*
  506 F.3d 922 (9th Cir. 2007) .............................. 17, 26, 27, 28, 29, 30

*Holz Rubber Co., Inc. v. Am. Star Ins. Co.*, 14 Cal. 3d 45, 56, 120 Cal. Rptr. 415,
   533 P.2d 1055 (1975) ................................................................ 21

*Hyundai Motor Am. v. Nat'l Union Fire Ins. Co.*,
   600 F.3d 1092 (9th Cir. 2010) ................................................. 20

*KB Home v. St. Paul Mercury Ins. Co.*,
   621 F. Supp. 2d 1271 (S.D. Fla. 2008) ................................... 32

*MacKinnon v. Truck Ins. Exch.*,
   31 Cal. 4th 635, 648, 3 Cal. Rptr. 3d 228, 73 P.3d 1205 (2003) ............. 16, 21, 22

*Medill v. Westport Ins. Corp.*,
   143 Cal. App. 4th 819 (2006) .................................................. 34

*Northrop Grumman Corp. v. Factory Mut. Ins. Co.*,
   563 F.3d 777 (9th Cir. 2009) ............................................. 21, 33

*Palmer v. Truck Ins. Exch.*,
   21 Cal. 4th 1109, 1115, 90 Cal. Rptr. 2d 647, 988 P.2d 568 (1999) .................. 20

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*,
   442 F.3d 741 (9th Cir. 2006) ................................................. 14

*Sprint PCS Assets, L.L.C. v. City of Palos Verdes Estates*,
   583 F.3d 716 (9th Cir. 2009) ................................................. 19

*State Farm Mut. Auto. Ins Co. v. Partridge*,
   10 Cal. 3d 94, 101–102, 514 P.2d 123, 109 Cal. Rptr. 811 (1973) ................... 36

*United States ex rel. Robinson Rancheria Citizens Counsel v. Borneo*,
   971 F.2d 244 (9th Cir. 1992) ................................................. 14

*Waller v. Truck Ins. Exch., Inc.*,
   11 Cal. 4th 1, 18, 44 Cal. Rptr. 2d 370, 900 P.2d 619 (1995) ..................... 20

*Westrec Marina Mgmt., Inc. v. Arrowood Indem. Co.*,
   163 Cal. App. 4th 1387, 1392, 78 Cal. Rptr. 3d 264 (2008) ................. 21

## Statutes

15 U.S.C. § 78a, *et seq.* ................................................... 10

28 U.S.C. § 2201 ................................................................ 1

28 U.S.C. § 2202 ............................................................................ 1

29 U.S.C. § 1332(a)(1) .................................................................. 1

Cal. Civ. Code § 1641 ................................................................. 21

## Other Authorities

*Merriam-Webster New Collegiate Dictionary* 604 (1977) .................................... 33

*Merriam-Webster New Collegiate Dictionary* 975 (1977) .................................... 33

*The Oxford English Dictionary* 417 (1961) ............................................. 33

*Webster's Third New International Dictionary* 1916 (1993) .................................. 33

## Rules

Fed. R. Evid. 201 ......................................................................... 14

Fed. R. Civ. P. 56(c) .................................................................... 19

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this declaratory judgment action to determine the existence of insurance coverage under 28 U.S.C. §§ 2201 and 2202, and under 29 U.S.C. § 1332(a)(1), because the amount in controversy as to each defendant exceeded $75,000, exclusive of interest and costs, and there is complete diversity between the parties.

On June 27, 2012, the district court issued an order granting plaintiffs-appellees' Motions for Summary Judgment and denying defendants-appellants' Motions for Summary Judgment. On July 2, 2012, the district court entered final judgment disposing of all claims of all parties in the case. (Appellants' Joint Excerpt of Record ("E.R.") 10-24.) Defendant William Rothman, the assignor of the FDIC's claims in this appeal, timely filed a notice of appeal on July 13, 2012. (E.R. 81-85.) The Motion to Substitute Party and/or Join Party filed by the FDIC was granted by this Court on January 15, 2013. (Dkt. No. 4.) This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUE PRESENTED

Under California law insurance coverage exclusions are narrowly construed to meet the reasonable expectations of the policyholder. The directors' and officers' ("D&O") insurance policies at issue here exclude coverage for matters sufficiently related to specific litigation involving IndyMac Bank's residential lending practices (a suit referred to as "*Tripp*") to constitute a single "Claim". Did

1

the district court correctly apply the "Specific Litigation" or "*Tripp*" exclusion to deny coverage for FDIC claims that did not in any way involve residential mortgage lending, but arose from a different bank division, and had no parties, wrongful acts, transactions, loan policies, or losses in common with *Tripp*?

## STATEMENT OF THE CASE

### I.     NATURE OF THE CASE

These consolidated appeals challenge the district court's interpretation of insurance policy language to exclude coverage for claims with a "broad range of relationships" with other claims made under a prior year's policy. The Federal Deposit Insurance Corporation as Receiver for IndyMac Bank, F.S.B.[1] ("FDIC") seeks reversal of the portion of the district court's order denying coverage under a 2008-2009 insurance "tower" ("Tower 2" or the "2008-2009 Policies") for the FDIC's claims in a case brought against former officers of a division of IndyMac Bank known as the Homebuilder Division ("HBD"). *Federal Deposit Insurance Corporation as Receiver For IndyMac Bank, F.S.B. v. Van Dellen, et al.*, Case No. 10-cv-4915, filed in the United States District Court, Central District of California (the "*HBD Action*" or "*HBD*"). The FDIC alleged that the defendant HBD officers, including William Rothman, the FDIC's assignor in this appeal, negligently approved certain individual short-term acquisition, development and construction ("AD&C") loans to homebuilders by failing to ensure that the

---

[1] IndyMac Bank, F.S.B. is referred to herein as "IndyMac" or the "Bank".

weaknesses associated with each loan were offset by its strengths. Importantly, the *HBD Action* had nothing to do with the Bank's residential mortgage lending activities, which were underwritten and securitized by an entirely different division of the Bank and subject to separate underwriting guidelines. On December 7, 2012, the jury in the *HBD Action* entered a verdict in favor of the FDIC for approximately $169 million on 23 specific loans[2].

The district court denied coverage for the *HBD Action* under Tower 2 based on its broad construction of the policy exclusion for claims related to those asserted in the lawsuit entitled *Wayman Tripp and Sven Mossberg v. IndyMac Bancorp, Inc. and Michael W. Perry*, Case No. 07-cv-1635, filed in the United States District Court, Central District of California (the "*Tripp Litigation*" or "*Tripp*"). With very little analysis, the court concluded that *Tripp* and *HBD* were sufficiently related to be deemed a single Claim first made and reported in the 2007-2008 policy year ("Tower 1" or the "2007-2008 Policies"). But *Tripp* and *HBD* involve different parties, different Bank divisions, different wrongful acts, different transactions, different loan policies, and different losses. The district court's treatment of *Tripp* and *HBD* as a single Claim is at odds with well-settled California law that policy exclusions be narrowly construed and with this Court's decisions applying that bedrock principle.

---

2 The verdict addressed 23 of 68 counts in the FDIC's complaint. The 45 other counts remain to be tried later. The remaining counts allege over $200 million in

## II.     PROCEEDINGS BELOW.

On March 10, 2011, the Side-A Insurers[3] filed a complaint seeking a declaration that the D&O liability insurance issued to the Bank's parent company, IndyMac Bancorp, Inc. ("Bancorp"), for the policy period March 2008 to April 2009 ("2008-2009 Side-A Policies") did not cover seven separate claims, including the *HBD Action*.[4] (E.R. 137-139.) The Side-A Insurers alleged that the 2008-2009 Side-A Policies precluded coverage for these claims based on the Interrelated

---

losses beyond the amount already awarded.

[3] The Side-A Insurers issued the four highest tiers of insurance that provided coverage only to the directors and officers and not to the Bank. These insurers were the same in both policy years and were XL Specialty, Arch, ACE, and Axis. (E.R. 280-368; 447-523.)

[4] These claims were described as (1) *Folsom v. IndyMac Bancorp, Inc., et al.*, Case No. 08-cv-3812, *Ariel Investments Ltd. v. IndyMac Bancorp, Inc., et al.*, Case No. 08-cv-4302, *Yukelson v. Perry, et al.*, Case No. 08-cv-4591, *Mazal Investment Partners v. IndyMac Bancorp, Inc., et al.*, Case No. 08-cv-4923 and *Daniels v. Michael W. Perry, et al.*, Case No. 08-cv-5073, all of which were filed in the United States District Court, Central District of California (collectively, the "Daniels Litigation"); (2) *IBEW Local 103 v. IndyMac Bank MBS, Inc*, Case No. BC405843, filed in the California Superior Court for Los Angeles County (later removed to the United States District Court, Central District of California, Case No. 09-cv-01520) and *In re IndyMac Mortgage-Backed Securities Litigation*, Case No. 09-cv-4583, filed in the United States District Court, Southern District of New York (collectively, the "MBS Litigation"); (3) FDIC Letter; (4) FDIC Litigation; (5) *Siegel v. Caldera, et al.*, Case No. 2:09-ap-2645, filed in the United States Bankruptcy Court, Central District of California (the "Siegel Litigation"); (6) *MBIA Insurance Corporation v. IndyMac ABS, Inc., et al.*, Case No. BC422358, filed in the California Superior Court for Los Angeles County (the "MBIA Litigation"); and (7) *Assured Guaranty Municipal Corp. v. UBS Securities LLC, et al.*, Case No. BCC445785, filed in the California Superior Court for Los Angeles County (the "Assured Guaranty Litigation"). The "FDIC Letter" was the claim letter that led to the "FDIC Litigation," which is the *HBD Action*. (E.R. 137-144.)

Wrongful Acts limitation, the Prior Notice exclusion and/or the Specific Litigation or *Tripp* exclusion. (E.R. 139.) The complaint named as defendants the same insured individual policyholders who were defendants in the underlying lawsuits that potentially implicated the insurance. (E.R. 136.)

On July 20, 2011, the defendant policyholders filed a counterclaim against the Side-A Insurers, as well as the Side-ABC Insurers[5] who issued the 2008-2009 Side-ABC Policies[6], seeking a declaration that those policies obligated the Insurers to reimburse defense costs and provide indemnity coverage for the seven claims addressed in the Side-A Insurers' complaint, plus three additional claims described in the counterclaim as the Trustee Demand, the FDIC Demand, and the SEC

---

[5] The Side-ABC Insurers provided the lowest four tiers of coverage and insured the Bank as well as the directors and officers. For the 2008-2009 Policies, the Side-ABC Insurers were Catlin, Zurich, Twin City, and Continental. (E.R. 188-279.) For the 2007-2008 Policies, some of the tiers were insured by different insurers. (E.R. 369-446.) Those insurers are not parties to this action. The insurers who are parties to this action are hereinafter referred to as the "Insurers."

[6] The 2008-2009 Side-A Policies and the 2008-2009 Side-ABC Policies collectively make up the 2008-2009 Policies.

Litigation.[7]  (E.R. 150-157, 159-169.)  Collectively, these ten claims make up the "Underlying Litigation."  After the parties cross-moved for summary judgment, the district court granted summary judgment to the Insurers and denied summary judgment to the policyholder defendants.  (E.R. 10-20.)  The district court concluded that all ten claims in the Underlying Litigation constituted a single Claim under IndyMac's D&O insurance and therefore were not covered under Tower 2.  (E.R. 17.)

On July 2, 2012, the district court entered final judgment resolving the entire case in favor of the Insurers, and the policyholders appealed.  (E.R. 21-24, 25-145.)

## STATEMENT OF FACTS

### I.    INDYMAC'S D&O INSURANCE POLICIES.

IndyMac was a federally-insured savings and loan association.  Before IndyMac failed on July 11, 2008, Bancorp, IndyMac's parent, obtained D&O liability insurance with limits of $80 million covering the period March 1, 2007 through March 1, 2008 (the Tower 1 or 2007-2008 Policies).  (E.R. 369-523.)  The

---

[7] The counterclaim redefined the "Siegel Litigation" used in the Side-A Insurers' complaint as the "Trustee Litigation", but both refer to a suit captioned *Siegel v. Caldera, et al.*, Case No. 2:09-ap-2645, filed in the United States Bankruptcy Court, Central District of California.  (E.R. 156.)  The three new additional claims added to the counterclaim are described as: the FDIC Demand, which was the claim letter that led to the matter captioned *Federal Deposit Insurance Company, as Receiver for IndyMac Bank, F.S.B. v. Michael Perry*, Case No. 11-cv-5561, filed in the United States District Court, Central District of California ("*FDIC-R v. Perry*"); the Trustee Demand, which led to the Trustee/Siegel Litigation; and the SEC Litigation, which is a suit captioned *Securities and Exchange Commission v. Michael W. Perry, et al.*, Case No. 11-cv-01309, filed in the United States District

first four policies provided coverage of $10 million per policy and provided coverage to the insured directors and officers ("Side-A Coverage") as well as other coverage specific to the corporation, which is not pertinent here ("Side-B and Side-C Coverage"). (E.R. 369-446.) These policies all generally followed the "claims made and reported" policy issued by Lloyds. (E.R. 404-405, 415, 417, 428-429, 433.) An additional $40 million in limits was provided by four other insurance policies and provided only Side-A Coverage. (E.R. 447-523.) These policies followed an insurance policy issued by XL Specialty. (E.R. 499-501, 492, 518, 521.)

Before the 2007-2008 Policies expired, Bancorp negotiated the Tower 2 or 2008-2009 Policies, which were a renewal of its D&O insurance covering the period March 1, 2008 through April 1, 2009. (E.R. 1486, 1501.) The renewal increased the annual premium for the 2008-2009 Policies by over 250% to approximately $6 million from the premium for the 2007-2008 Policies. (E.R. 1475, 1478.) Again, the first four policies provided $40 million in Side-A, B and C Coverage and generally followed form to the Lloyds' primary policy. (E.R. 188-279; 233, 244, 249, 251-253, 265-266, 277.) The remaining $40 million provided only Side-A Coverage and generally followed form to the XL policy. (E.R. 280-368; 318, 320, 326, 337-339, 352, 362.) With the exception of layers three and four in the 2008-

Court, Central District of California. (E.R. 155-157.)

2009 Policies, the same insurers extended coverage in 2008-2009 as had extended coverage in 2007-2008.  (E.R. 414-446, 248-279.)  The policies were nearly identical from 2007-2008 to 2008-2009, with the only relevant difference being the addition of the Specific Litigation exclusion or, in certain policies, the Prior Notice exclusion.[8]  (E.R. 188-523.)

The D&O Policies include or incorporate a commitment to pay "on behalf of" the insured directors and officers "**Loss** resulting from any **Claim** first made against the **Directors and Officers** during the **Policy Period** for an **Individual Act**."[9] (E.R. 289, 375; *See also* E.R. 289, 473.) (Emphasis in original.)  The insurance policy year "triggered" by a claim is that year when the claim is first made and reported to the insurer, regardless of when the events giving rise to the claim occur.[10]  IndyMac's "claims made and reported" D&O insurance is typical of D&O insurance in this regard.

All of the D&O Policies include or incorporate a provision to the effect that "all **Claims** arising from the same **Interrelated Wrongful Acts** shall be deemed to

---

8 The 2007-2008 and 2008-2009 Policies are collectively referred to as the "D&O Policies."

9 The XL Side-A Only Coverage states that the insurer will "pay on behalf of the **Insured Persons Loss** first resulting from a **Claim** first made against the **Insured Persons** during the Policy Period. . . ." (E.R. 473, 289.)

10 In this important sense, the "trigger" of "claims made and reported" policies is different from "occurrence" policies which are triggered by damage occurring during the policy period, even if the claim is first made after the expiration of the policy.

constitute a single **Claim** and shall be deemed to have been made at the earliest time at which the earliest such **Claim** is made or deemed to have been made. . . ." (Emphasis in original) (Addendum A;[11] E.R. 294, 478; *See also* E.R. 210-211, 383.) The policies include or incorporate slightly varying definitions of "Interrelated Wrongful Acts", but all of the definitions require the "Wrongful Acts" which serve as the basis for the claims to be related in some manner. (Addendum A; E.R. 205, 290, 343, 378, 474, 491, 508.)

The 2008-2009 Policies also include or incorporate a "Specific Litigation" or "*Tripp*" exclusion eliminating coverage for claims which involve "any fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events, or transactions underlying or alleged in the *Tripp* litigation." (Addendum B;[12] E.R. 230, 315.) Certain policies also include or incorporate a "Prior Notice" exclusion excluding coverage of claims where notice was given prior to inception of the policy. (Addendum C;[13] E.R. 207, 258, 291-292, 343.)

## II.   THE *TRIPP LITIGATION*.

The *Tripp Litigation* was filed on behalf of a class of those who acquired Bancorp stock during the period from March 1, 2006 through March 1, 2007.

---

[11] Addendum A affixed hereto contains the pertinent provisions from the D&O Policies relating to the Interrelated Wrongful Acts limitation.

[12] Addendum B affixed hereto contains the pertinent provisions from the D&O Policies relating to the Specific Litigation or *Tripp* exclusion.

[13] Addendum C affixed hereto contains the pertinent provisions from the D&O Policies relating to the Prior Notice exclusion.

(E.R. 582.)  The defendants are Bancorp and Michael W. Perry, the Chairman of the Board of Directors and Chief Executive Officer of Bancorp and the Bank. (E.R. 589.)

The operative complaint in *Tripp* alleges Exchange Act[14] violations arising from defendants' alleged misrepresentations concerning their business model of aggressive, high-risk, volume-driven lending in the *residential* mortgage loan market, despite worsening economic conditions.  (E.R. 582-587.)

The products at issue in *Tripp* were Alt-A interest only, negative amortizing ("NegAm") loans, adjustable rate mortgages ("ARMs"), "piggyback" loans, and low/no documentation loans—all residential lending products.  (E.R. 582-583.) The *Tripp* complaint asserts six specific categories of alleged misstatements relating to IndyMac's residential mortgage loans:  rate lock commitments, loan loss reserves, quality control, brokers, underwriting guidelines, and appraisal reviews.  (E.R. 595, 618-658.)  The *Tripp* plaintiffs allege that defendants made these false and misleading statements in order to artificially inflate the price of Bancorp's stock. (E.R. 658-659.)

None of the allegations of wrongdoing in *Tripp* relate to, or even mention, the activities of HBD, the Bank's separate free-standing division which originated

---

14 The *Tripp* complaint alleges violations of Section 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.  15 U.S.C. § 78a, *et seq.* (E.R. 582.)

AD&C (not residential) loans and had its own loan policies.  HBD's officers were not named as defendants in *Tripp*.  (E.R. 578-685, 695, 708.)

## III.    THE FDIC'S CLAIMS.

After the FDIC became IndyMac's receiver, it issued two separate demand letters each dated March 27, 2009 – one to Perry and others (the "Perry Demand")[15] and one to Scott Van Dellen, HBD's Chief Executive Officer, Richard Koon, HBD's Chief Lending Officer, and Kenneth Shellem, HBD's Chief Credit Officer (who were three of the four defendants named in the *HBD Action*) (the "HBD Demand").[16] (E.R. 1135-1145.)  Each demand sought recovery for different losses resulting from different negligent acts.  *Id.*  Specifically, the Perry Demand requested payment of civil damages arising out the negligent "origination, underwriting, securitization and marketing of the securities of 'Alt A', 'subprime' and 'Option ARM' residential mortgage loans, and for 'expanding the Bank's involvement in these loan markets and in holding loans for investment.'"  (E.R. 17, 1142.)  The Perry Demand ultimately led to *FDIC-R v. Perry*, which the FDIC filed in July 2011.  (E.R. 17, 1091-1134.)  FDIC does not challenge the ruling that *FDIC-R v. Perry* is only covered under the 2007-2008 Policies instead of under the 2008-2009 Policies. (E.R. 17.)

---

[15] The Perry Demand was described by the district court as the "FDIC Demand".
[16] The HBD Demand was identified in the complaint in the district court as the "FDIC Letter". (E.R. 136-145.)

By contrast, the separate HBD Demand requested payment of $200 million for losses stemming from the negligent practices carried out or permitted by Messrs. Van Dellen, Koon, and Shellem in connection with AD&C loans HBD made to homebuilders. (E.R. 1135-1139.) The HBD Demand constituted a claim made and reported to the Insurers during the 2008-2009 policy term, and ultimately led to the *HBD Action*. (E.R. 140-142, 1135-1139.)

## IV.    THE *HBD ACTION*.

The FDIC brought the *HBD Action* only for "claims against former officers of [the Bank] arising out of the operations of the Bank's Homebuilder Division". HBD was a separate division of the Bank that provided loans to homebuilders in select markets throughout the United States.[17] (E.R. 695.) HBD's loans were typically for $5 million or more and for time periods limited to three years or less, which enabled developers to finance the acquisition, development and/or construction of large tract developments. (E.R. 702, 1190-1191.) The loans went through an application process that included the completion of Credit Approval Memoranda or "CAMs" that averaged 80 pages. (E.R. 711.) HBD also had its own 75-page credit policy that was unique to HBD and "critical to its success in providing a specialized lending product". (E.R. 708.)

The *HBD Action* involved only the Bank's losses stemming from HBD's activities, which, in total, exceeded $500 million. (E.R. 700.) The *HBD* complaint

named as defendants only key members of HBD's management team, including
Messrs. Van Dellen, Koon, and Shellem, as well as William Rothman, HBD's
regional manager and, beginning in 2006, Chief Lending Officer (The "*HBD
defendants*"). The *HBD* defendants all served on HBD's loan committees and
approved the HBD loans at issue. The suit alleged negligence and breaches of
defendants' fiduciary duties. (E.R. 696-699.) None of the parties to the *HBD
Action* were parties in *Tripp*. (*Id.*)

In *HBD,* the FDIC alleged that the *HBD* defendants negligently approved
each of the 66 individual short-term AD&C loans specifically identified in the 309-
page complaint. (E.R. 720-1001.) The 66 loan counts alleged facts specific to the
*HBD* defendants' negligent assessment of the quality of the market, project,
borrower(s), and secondary sources of repayment (such as guarantors) for each
loan. (*Id.*) The details relating to the strengths and weaknesses of each loan were
set forth in the relevant CAM, and HBD's credit policies required the *HBD*
defendants to ensure that the weaknesses of each loan were offset by
corresponding strengths before approving the loan. (E.R. 74, 708-711.) Yet, as
alleged in the *HBD* complaint and proven with respect to twenty-three of the loans,
the *HBD* defendants disregarded HBD's *own* separate credit policies designed to
reduce risk and ignored the loans' weaknesses in order to increase AD&C loan

---

17 HBD constituted only 5% or less of the assets of the Bank. (E.R. 1191.)

production.  (*Id.*)[18]

The wrongdoing and losses alleged in *HBD* were independent of any other wrongdoing and losses associated with the Bank's other business units.  The *HBD Action* alleged negligence and breach of fiduciary duties with respect to AD&C lending, not misrepresentations to shareholders about the Bank's *residential* mortgage lending and securitization programs, nor any other wrongful acts relating to those programs.  (E.R. 686-1004.)

## V.    THE DISTRICT COURT'S JUNE 27, 2012 ORDER.

On June 27, 2012, the district court issued its order granting the Insurers' motions for summary judgment and denying the policyholder defendants' motions for summary judgment.  (E.R. 10-20.)  The district court focused its analysis on the relationship of the Underlying Claims to the claims in *Tripp*, finding that the Interrelated Wrongful Acts limitation and the Prior Notice and Specific Litigation

---

[18] The *HBD Action* is currently pending in the Central District of California.  (E.R. 687.)  Twenty-three of the 68 counts in the complaint were tried before Judge Dale S. Fischer, resulting in the entry of a jury verdict in favor of the FDIC for approximately $169 million on December 7, 2012. The court has also held that FDIC is entitled to prejudgment interest (the exact amount of which has not yet been calculated).  Final Judgment has not yet been entered, and a trial date has not been set on the remaining 45 counts in the complaint.  In support of the foregoing, this Court may take judicial notice of the *Van Dellen* docket and Docket Nos. 596 and 623.  Fed. R. Evid. 201; *United States ex rel. Robinson Rancheria Citizens Counsel v. Borneo*, 971 F.2d 244, 248 (9th Cir. 1992) (internal citation omitted); *see also Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) (an appellate court "may take judicial notice of court filings and other matters of public record."); *Bennett v. Medtronic, Inc.*, 285 F.3d 801, 803 (9th Cir. 2002) (judicial notice take of amended complaint in another court).

exclusions each unambiguously "describe[] a broad range of relationships between the original claim and other lawsuits that it will be deemed as part of that same claim and made at the same time of the first claim, in this case as part of the Tripp litigation and prior to the Tower 2 policies." (E.R. 13-16.) The district court applied this broad definition of the exclusionary clauses to hold that each of the claims set forth in each Underlying Litigation, including the *HBD Action*, were sufficiently related to the *Tripp Litigation* to be excluded from coverage under the 2008-2009 Policies. (E.R. 17-20.)

The district court disposed of the *HBD* claims in a single paragraph. The court acknowledged that "[t]he FDIC-HBD matter focuses specifically on the actions of the Home Builders Division ('HBD'), rather than IndyMac as a whole." (E.R. 18.) Apparently attaching no significance to any other difference between *Tripp* and *HBD*, the court found the claims related because they both "center on the fact that the HBD approved loans in violation of IndyMac's underwriting standards, allegations that are shared in common with the Tripp litigation." Finally, the court concluded that "the FDIC-HBD matter falls and is excluded from indemnification and defense costs under the Tower 2 policies" based on the reasoning in Section IV.B.2. of the opinion—the section dealing with the FDIC's entirely separate claims against Perry and others, which, unlike *HBD*, involved

negligence in the origination and securitization of residential mortgage loans.[19]
(E.R. 18.)

## SUMMARY OF ARGUMENT

The district court's expansive interpretation of the Tower 2 policy
exclusions essentially renders worthless insurance coverage for which Bancorp
paid a $6 million premium—more than 250% more than the premium charged in
the previous year. But it is well-settled in California that exclusions in insurance
contracts are to be narrowly construed. *MacKinnon v. Truck Ins. Exch.*, 31 Cal.
4th 635, 648, 3 Cal. Rptr. 3d 228, 73 P.3d 1205 (2003).

The district court's sweeping interpretation is at odds with this Court's
narrow interpretation of similar exclusions consistent with California law in *Fin.
Mgmt. Advisors, LLC v. Am. Int'l Specialty Lines Ins. Co.*, 506 F.3d 922 (9th Cir.
2007) and *Eureka Fed. Sav. and Loan Ass'n v. Am. Cas. Co. of Reading, Pa.*, 873
F.2d 229, 234 (9th Cir. 1989).

In *Financial Management Advisors,* the Court held that two claims were not
related so as to be a single claim even though they shared some overlapping facts.
*Fin. Mgmt. Advisors, LLC, supra,* 506 F.3d at 925-926. In reversing a grant of
summary judgment denying coverage, the Ninth Circuit criticized the lower court

---

[19] As explained above, FDIC does not challenge the ruling that *FDIC-R v. Perry* is
interrelated with *Tripp* and only covered under the 2007-2008 Policies on the
ground that, like *Tripp, FDIC-R v. Perry* raises only claims relating to IndyMac's
*residential* mortgage lending. *See* n. 17, *supra.*

for focusing solely on shared facts and failing to consider the obvious differences between the two claims. *Id.* The district court's determination here suffers from the same defect. It focuses solely on the fact that the *HBD* and *Tripp* claims both generally allege violations of underwriting standards (albeit different underwriting standards) without any consideration of the fact that the two claims involve *different* wrongful acts, *different* transactions, *different* loan policies, and *different* losses.

Even if both *HBD* and *Tripp* involved a common business plan (which they do not), this alone would be insufficient as a matter of law to exclude coverage for *HBD*. *Eureka Fed. Sav. and Loan Ass'n v. Am. Cas. Co. of Reading, Pa.*, 873 F.2d 229, 234 (9th Cir. 1989) (Court held that even loan losses arising from the same aggressive lending policy did not constitute a single loss because there were "numerous intervening business decisions that took place after the loan policy was initiated that required the exercise of independent business judgment".)

This Court's application of California law in *Financial Management Advisors* and *Eureka* is consistent with the California Supreme Court's interpretation of "relatedness" in insurance policy exclusions. In *Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.*, 5 Cal. 4th 854, 873, 855 P.2d 1263, 21 Cal. Rptr. 2d 691 (1993) the Court concluded that the term "related" in an exclusionary clause encompassed both logical and causal connections, but would *not* include claims that are "so attenuated or unusual that an objectively reasonable

insured could not have expected they would be treated as a single claim under the policy." *Id.*  The relationship between the *HBD* and *Tripp* claims exemplifies the California Supreme Court's description of claims too attenuated or unusual to be treated as a single claim.  *HBD* shares no "common nexus" with *Tripp*, nor is *HBD* "based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving" the allegations in *Tripp*.  An "objectively reasonable" insured would not expect the two lawsuits to be treated as a single claim.

In sum, the district court's treatment of *Tripp* and *HBD* as a single Claim is at odds with well-settled California law that policy exclusions be narrowly construed, this Court's application of the California rules to interpret similar policy language, and the California Supreme Court's interpretation of "related" claims. Accordingly, this Court should reverse the portion of the district court's order denying coverage for the *HBD Action* under the 2008-2009 Policies.

## ARGUMENT

### I.    STANDARD OF REVIEW

An appellate court reviews a grant of summary judgment *de novo*, applying the same standards applied in the trial court under Federal Rule of Civil Procedure 56(c).  *Crowley v. Nevada*, 678 F.3d 730, 733 (9th Cir. 2012).  Accordingly, the appellate court "view[s] the evidence in the light most favorable to the nonmoving party, asking whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Id.*  "All justifiable

factual inferences must be drawn in the [nonmoving party's] favor, and [the Court] must reverse the grant of summary judgment if any rational trier of fact could resolve a material factual issue in the [nonmoving party's] favor." *Sprint PCS Assets, L.L.C.* v. *City of Palos Verdes Estates*, 583 F.3d 716, 720 (9th Cir. 2009).

When reviewing a grant of summary judgment, the Court may reverse the district court *and*, after reviewing questions of law *de novo*, grant summary judgment in favor of the originally-non-prevailing party, if appropriate. *Ferguson* v. *Coregis Ins. Co.*, 527 F.3d 930, 932 (9th Cir. 2008) (Court reviewed district court's determination that policy limits were unambiguous *de novo* and determined that, while it agreed the agreement was unambiguous, the district court had come to the wrong conclusion on the limits. The Court reversed the district court's grant of summary judgment to the insurer and granted summary judgment in favor of the insured.) Alternatively, the Court may reverse and remand with instructions for the district court to enter summary judgment in the policyholder's favor. *Bodell v. Walbrook Ins. Co.,* 119 F.3d 1411, 1418 (9th Cir. 1997) (determining that the district court interpreted statutory and public policy exclusions too broadly, Court reversed summary judgment in favor of an insurer and remanded with instructions for the district court to enter summary judgment in favor of the policyholder.)

## II.   THE DISTRICT COURT ERRED IN GRANTING THE INSURERS' MOTIONS FOR SUMMARY JUDGMENT AND DENYING THE POLICYHOLDER DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT.

### A.   California Law Construes Policy Exclusions Narrowly.

California law governs an insurance policy dispute brought in a diversity action. *Hyundai Motor Am. v. Nat'l Union Fire Ins. Co.,* 600 F.3d 1092, 1097 (9th Cir. 2010).  "[I]nterpretation of an insurance policy is a question of law." *Waller v. Truck Ins. Exch., Inc.,* 11 Cal. 4th 1, 18, 44 Cal. Rptr. 2d 370, 900 P.2d 619 (1995). "While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply." *Bank of the West v. Super. Ct.,* 2 Cal. 4th 1254, 1264, 10 Cal. Rptr. 2d 538, 833 P.2d 545 (1992); *Palmer v. Truck Ins. Exch.,* 21 Cal. 4th 1109, 1115, 90 Cal. Rptr. 2d 647, 988 P.2d 568 (1999).  Therefore, "the mutual intention of the parties at the time the contract is formed governs interpretation." *Palmer, supra,* 21 Cal. 4th at 1115.  The court infers the parties' intent, "[i]f possible . . . solely from the written provisions of the insurance policy." *Id., quoting AIU Ins. Co. v. Super. Ct.,* 51 Cal. 3d 807, 822, 274 Cal. Rptr. 820, 99 P.2d 1253 (1990).

In so doing, the court considers a policy's terms in context and "interpret[s] words . . . in accordance with their ordinary and popular sense, unless the words are used in a technical sense or a special meaning is given to them by usage." *Westrec Marina Mgmt., Inc. v. Arrowood Indem. Co.,* 163 Cal. App. 4th 1387, 1392, 78 Cal. Rptr. 3d 264 (2008); *see also Palmer, supra,* 21 Cal. 4th at 1115.

This means that "the policy should be read as a layman would read it and not as it might be analyzed by an attorney or insurance expert." *Delgado v. Heritage Life Ins. Co.*, 157 Cal. App. 3d 262, 271, 203 Cal. Rptr. 672 (1984), *quoting Otter v. General Ins. Co.*, 34 Cal. App. 3d 940, 949, 109 Cal. Rptr. 831 (1973). In fact, "dictionary definitions are an appropriate consideration in evaluating the ordinary meaning of terms in an insurance contract." *Northrop Grumman Corp. v. Factory Mut. Ins. Co.*, 563 F.3d 777, 784 n.4 (9th Cir. 2009). Courts must also interpret a policy's terms "in context" and give effect "to every part" of the policy with "each clause helping to interpret the other." *Bank of the West, supra*, 2 Cal. 4th at 1265; Cal. Civ. Code § 1641; *see also Holz Rubber Co., Inc. v. Am. Star Ins. Co.*, 14 Cal. 3d 45, 56, 120 Cal. Rptr. 415, 533 P.2d 1055 (1975). "The burden is on the insured to establish that the claim is within the basic scope of coverage and on the insurer to establish that the claim is specifically excluded." *MacKinnon, supra,* 31 Cal. 4th at 648.

Insurance coverage is "interpreted broadly so as to afford the greatest possible protection to the insured, … whereas exclusionary clauses are interpreted narrowly against the insurer." *MacKinnon, supra,* 31 Cal. 4th at 648 (citation and internal quotation marks omitted). Insurance policy exclusions must be "*conspicuous, plain and clear,*" otherwise they are "strictly construed" in favor of the policyholder. *E.M.M.I. Inc. v. Zurich Am. Inc. Co.,* 32 Cal. 4th 465, 471, 9 Cal. Rptr. 3d 701, 84 P.3d 385 (2004) (citations omitted) (emphasis in original).

"[A]ny exception to the performance of the basic underlying obligation must be so stated as clearly to apprise the insured of its effect. Thus, the burden rests upon the insurer to phrase exceptions and exclusions in clear and unmistakable language." *MacKinnon, supra,* 31 Cal. 4th at 648. "This rule applies with particular force when the coverage portion of the insurance policy would lead an insured to reasonably expect coverage for the claim purportedly excluded." *Id.; Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.*, 5 Cal. 4th 854, 873, 855 P.2d 1263, 21 Cal. Rptr. 2d 691 (1993) (court concluded that the term "related" in the exclusionary clause encompassed both logical and causal connections, but would *not* include claims that are "so attenuated or unusual that an objectively reasonable insured could not have expected they would be treated as a single claim under the policy.")

**B.    The *Tripp Litigation* and the *HBD Action* are Not Sufficiently "Related" to Constitute a Single Claim as a Matter of Law.**

The district court ruled that *Tripp* and *HBD* are sufficiently related to constitute a single Claim under the D&O Policies based on one fact alone—that both lawsuits broadly involve IndyMac's lending activities. But well-settled California law, consistently applied by this Court, requires that to invoke the *Tripp* exclusion, the insurers must demonstrate a much more direct and meaningful relationship between the two claims. The Insurers cannot meet this standard because, beyond the fact that both suits generally challenge Bank lending practices, the *Tripp* and *HBD* actions have *nothing* in common.

22

First, *HBD* and *Tripp* do not involve the same parties. *Tripp* was brought on behalf of a class who acquired Bancorp stock during the Class Period from March 1, 2006 through March 1, 2007. (E.R. 582.) The defendants are Bancorp and Michael Perry, the Chairman of the Board of Directors and CEO of Bancorp and the Bank. (E.R. 579, 589.) On the other hand, *HBD* was brought by the FDIC, a federal regulator, in its capacity as Receiver for the Bank against key members of HBD's management team including, Messrs. Van Dellen, Koon, Shellem, and Rothman. (E.R. 695-699.)

Second, *HBD* and *Tripp* do not involve the same IndyMac business units. *Tripp* involves the Mortgage Banking Division's underwriting and securitization of thousands of *residential* mortgages (E.R. 582-587, 589, 590-591.) In contrast, HBD provided multi-million dollar AD&C loans to homebuilders in select markets throughout the United States. (E.R. 695.) HBD was a small division of the Bank (constituting only 5% of the Bank's assets) with separate credit policies,[20] borrowers, employees, and officers from those involved in *Tripp*. (E.R. 695, 702, 1190-1191.)

Third, *HBD* and *Tripp* do not involve the same causes of actions or factual allegations. *Tripp* alleges violations of Sections 10(b) and 20(a) of the Exchange

---

[20] The Insurers omitted evidence below that would have clearly shown HBD's different loan underwriting policies. Notably, although the Insurers did identify the "FDIC Letter," the claim letter that led to the *Van Dellen Action* (E.R. 146-149), they omitted the letter's exhibits, including Exhibit C, which is HBD's

Act and Rule 10b-5 promulgated thereunder based on Perry's and Bancorp's misrepresentations concerning the Bank's business model of aggressive, high-risk, volume-driven lending in the *residential* mortgage loan market, despite worsening economic conditions. (E.R. 582-587, 618-658.) *HBD* alleged negligence and breaches of fiduciary duties stemming from the *HBD* defendants' negligent approval of 66 individual, short-term AD&C loans with serious market and project weaknesses, limited secondary sources of repayment, and minimal strengths to offset known weaknesses. (E.R. 695-696, 720-1001.)

Fourth, *HBD* and *Tripp* do not even involve the same types of loans, much less any specific loan transactions. *Tripp* only involves IndyMac's residential lending activities and securitization of thousands of relatively small, long term residential mortgages, (*See, e.g.*, E.R. 582-587, 605-617.) In contrast, *HBD* involved 66 individual loans, typically of $5 million or more for terms of three years or less, to homebuilders and developers in select markets throughout the United States. (E.R. 702, 720-1001, 1190-1191.)

Fifth, *HBD* and *Tripp* do not involve the same losses. The *Tripp* claimants seek damages for the loss of share price suffered by Bancorp's stock during the Class Period. (E.R. 633-635.) In *HBD,* the FDIC sought, *inter alia*, damages

---

separate credit policies.

resulting from losses on 66 individual and specific loans approved by the *HBD* defendants. (E.R. 720-1001.)

Under the most reasonable reading of the policy language, controlling California law, and this Court's jurisprudence, there can be no "Interrelated Wrongful Acts" between the two claims, and neither the Prior Notice exclusion nor the *Tripp* exclusion can apply to preclude coverage. Accordingly, this Court should reverse the district court's ruling and enter summary judgment in favor of coverage of the *HBD Action* under the 2008-2009 Policies.

### 1. Controlling Ninth Circuit Authority Precludes Treating *Tripp* and *HBD* as a Single Claim.

The district court's judgment cannot be reconciled with this Court's decisions applying California law to interpret policy exclusions. Under that case law, even if both *HBD* and *Tripp* share some overlapping facts or involve alleged violations of underwriting policies or a business plan common to both claims (which they do not), this alone is insufficient as a matter of law to exclude coverage for *HBD*. *See Fin. Mgmt. Advisors, supra*, 506 F.3d at 925; *Eureka, supra*, 873 F.2d at 234.

First, the district court's sweeping interpretation of the Interrelated Wrongful Acts limitation and the Prior Notice and Specific Litigation or *Tripp* exclusions as excluding any claim that has ***any*** overlapping facts with *Tripp* flatly conflicts with the narrow interpretation this Court has given to similar exclusionary language. For example, in *Financial Management Advisors*, a case involving a similar

exclusion for claims related to those made in a prior year, the Court reversed the district court's grant of summary judgment denying coverage, criticizing the district court for focusing solely on shared facts and failing to consider the obvious differences between the two claims. *Id.*

In *Financial Management Advisors*, the policyholders purchased coverage for claims involving "wrongful acts" in the rendering of, or failure to render, investment advisory services. *Id.* at 923. The initial policy covered the period from May 2, 2002 to May 2, 2003 ("Policy I"), and in May 2003, the insurer issued a renewal policy covering the period from May 2, 2003 to May 2, 2004 ("Policy II"). *Id.* Pursuant to the policies, a claim brought under Policy II that "arises out of the same or related wrongful acts" as a claim brought under Policy I was treated as having been brought under Policy I.[21]  *Id.*

The policyholders sought coverage for two separate lawsuits brought by different investors who received financial advice from the same financial advisor, Malamed. *Id.* In the first lawsuit, the Sitrick family sued the policyholders alleging that Malamed made several misrepresentations in order to dissuade the

---

[21] Exclusion II(9) of Policy II excluded, "[A]ny claim arising out of the facts alleged, or **arising out of the same or related Wrongful Acts** alleged or contained, in any claim which has been reported, or in any circumstances of which notice has been given, under any policy which this policy is a renewal or replacement or which it may succeed in time." *Id.* at 924. (Emphasis in original.) Similarly, here, the XL Specialty policy definition of "Interrelated Wrongful Acts" and the Specific Litigation or *Tripp* exclusion includes the phrase "arising out of". (Addendums A & B; E.R. 230, 290, 315, 474.)

Sitricks from liquidating their equity investments and misrepresented the risk inherent in several Collateral Bond Obligation funds ("CBOs") (the "Sitrick claim"). *Id.* In 2004, the parties settled the Sitrick claim, exhausting the entire coverage limit of Policy I. *Id.*

In February 2004, the policyholders began settlement discussions with another client, Steinman. *Id.* In 1999, upon the advice of Malamed, Steinman invested in the CBO II fund. *Id.* at 924-925. When his investment declined, he sought recovery on the grounds that Malamed had misrepresented the riskiness of CBO II and breached his agreement by placing Steinman's investment in a different and riskier tranche than the one in which Steinman had agreed to invest (the "Steinman claim"). *Id.* The policyholder tendered the Steinman claim to the insurer, who denied coverage on the grounds that the claim arose out of the same wrongful acts as, or wrongful acts related to, those alleged by the Sitricks, and thus would be treated as having been made under Policy I. *Id.*

The policyholders sued the insurer for denying coverage for the Steinman claim. *Id.* The district court granted the insurer's motion for summary judgment, finding that the Sitrick and Steinman claims were related because both involved material misrepresentations made by the same financial advisor about the risk of investing in CBO II. *Id.*

The Ninth Circuit reversed. The Court held that because they did not "arise out of the same or related wrongful acts," the Sitrick and Steinman claims were not related. *Id.* at 925. The Court reasoned:

> "The Sitricks and Steinman were unrelated investors, with unique investment objectives. They were advised at separate meetings on separate dates, according to their unique financial positions. Indeed, the investment packages ultimately recommended to and chosen by each client were different – the Sitricks invested in several CBO funds as well as various equities, while Steinman invested only in CBO II."

*Id.* The Court stressed the differences between the wrongful acts alleged by the two clients,[22] criticizing the district court's focus "solely on the allegations … relating to the investment vehicle that was common to both investors – CBO II." *Id.* The Court also expressly rejected the insurer's contention that the Sitrick and Steinman claims were logically related, stating, "[w]e do not believe the term 'relate' was intended to bar recovery whenever two parties are advised to invest in the same fund. Nor are the Sitrick and Steinman Claims logically related simply because both claimants blame the same financial advisor." *Id.* at 926. Instead, "the Sitricks and Steinman are separate clients with distinct goals." *Id.*

*Financial Management Advisors* thus teaches that courts must look not only at the facts common to both claims, but must also consider the differences to

---

[22] The Court noted that the Sitricks complained of various omissions and oral misrepresentations made in connection with many different investment vehicles, whereas Steinman complained of written misrepresentations and breach of a written agreement to put Steinman's investment into a less risky CBO tranche. *Id.*

determine whether two claims are sufficiently related to exclude coverage for a later claim.[23]  Indeed, there were significantly fewer differences in *Financial Management Advisors* which, unlike here, at least involved the same investment and the same financial advisor.  Even so the Court interpreted exclusionary language similar to the language here narrowly to find that the claims were not sufficiently related to exclude coverage for the later claim.  *Fin. Mgmt. Advisors, supra*, 506 F.3d at 926.

*Financial Management Advisors* demonstrates the district court's error in failing to properly consider the many differences between the *HBD* and *Tripp* claims.  The district court here ignored the substantial differences between these two claims.  These differences clearly outweigh any arguable overlap because *HBD* and *Tripp* do not involve the same claimants, defendants, IndyMac business units, loan types, specific loan transactions, structural allegations, substantive

---

at 925-926.

[23] Similarly, in *Endurance Am. Specialty Ins. Co. v. WFP Sec. Corp.*, 11-cv-2611 JAH (KSC), 2012 U.S. Dist. LEXIS 153864 (S.D. Cal. September 28, 2012), the court determined that the "Phalen [Specific Litigation] Exclusion", which excluded any claim "based upon, arising out of, directly or indirectly resulting from, in consequence of in anyway involving: the Robert C. Phalen matter ....",  did not exclude the later-made *Kimler* claim for unsuitable investments because the claims were not sufficiently related for the exclusions to apply.  *Id.* at *24-29.  The court rejected the insurer's broad interpretation of the Phalen Exclusion as "directly contradict[ing] California law," and held, "[e]xclusion provisions are interpreted narrowly, and must be plain and clear. The Phalen Exclusion provision does not clearly exclude claims involving both related and unrelated issues, securities and

allegations, or losses.  Indeed, the operative *Tripp* complaint never once references HBD, the loans generated by HBD, HBD's underwriting or credit policies, or the *HBD* defendants.  (E.R. 578-685.)  Similarly, the *HBD* complaint never references *Tripp*, the *residential* mortgage loans generated by IndyMac in *Tripp*, the *Tripp* claimants, Bancorp's stock, or any alleged misrepresentations made in connection with IndyMac's loan activities. (E.R. 686-1004.)  Simply put, the facts that form the core of *Tripp* have nothing to do with those that form the core of *HBD*.

Second, under this Court's jurisprudence, even shared allegations of a common business plan or company-wide policies are insufficient to prove interrelatedness as a matter of law.[24]  *Eureka, supra*, 873 F.2d at 234.  In *Eureka*, the critical question was, "whether the losses in [the] [underlying] *Kidwell* [action] arose out of the same act (the loan policy) or [were] otherwise sufficiently interrelated to be considered a single loss."[25]  The *Kidwell* action involved claims against five officers of the policyholder for breach of fiduciary duty, negligence, mismanagement, and waste in connection with losses on over 200 loan

---

parties. Accordingly, the Phalen Exclusion does not exclude coverage of the *Kimler* arbitration." *Id.* at *28-29.

[24] The Insurers argued below that *Tripp* and *HBD* are interrelated because both implicated an aggressive growth strategy at IndyMac resulting in a companywide pattern of abandoning underwriting guidelines. (E.R. 1194-1195.)  The Insurers' argument cannot withstand scrutiny for the reasons discussed herein.

[25] The insurance policy at issue in *Eureka* provided that, "claims based on or arising out of the same act, interrelated acts, or one or more series of similar acts, or one or more Directors or Officers shall be considered a single loss..." *Id.* at 234.

transactions. *Id.* at 230-231. Rejecting the insurer's argument that the 200 *Kidwell*

claims constituted a single loss that resulted from an aggressive lending strategy,

the Court affirmed the district court's holding that "the mere existence of an

aggressive loan policy is insufficient as a matter of law to transform disparate acts

and omissions made by five directors in connection with issuance of loans to over

200 unrelated borrowers into a single loss." *Id.* at 235.    The Court explained:

> the fact that all loan losses arguably originated from one loan policy
> does not require finding only one loss. In this case there were
> numerous intervening business decisions that took place after the loan
> policy was initiated that required the exercise of independent business
> judgment. ... Thus, the decision to implement the aggressive loan
> policy did not cause the losses, rather it was the alleged negligence on
> the part of the *Kidwell* defendants in making or approving the
> individual transactions.

*Id.; see also KB Home v. St. Paul Mercury Ins. Co.*, 621 F. Supp. 2d 1271 (S.D.

Fla. 2008) (applying California law to expressly reject an insurer's assertion that

"the fact that all four complainants believed that the workplace culture was infused

with sexual harassment is adequate under the policy to prove interrelatedness" to

fine one of four claims unrelated to the other three because it did not arise out of

sexual harassment at the same event as the other claims did.)

Thus, under *Eureka*, even if the *Tripp* and *HBD* claims both implicate a

common aggressive growth strategy at IndyMac (which they do not), and even if

the same loan policies were involved (they are not), these facts alone are

insufficient as a matter of law to deem the disparate acts and omissions made by

the *HBD* defendants in connection with 66 individual loans sufficiently interrelated

to *Tripp* to preclude coverage for *HBD*.  Accordingly, under both *Financial*

*Management Advisors* and *Eureka*, the portion of the district court's order denying

coverage for the *HBD Action* under the 2008-2009 Policies must be reversed.

> ## 2. Under Controlling California Authority, the Relationship between the Claims Asserted in *Tripp* and the Claims in *HBD* is Too Attenuated to Constitute a Single Claim.

This Court's jurisprudence is consistent with the California Supreme Court's

holding that claims related in a way that is attenuated or unusual are not

sufficiently related to be treated as a single claim for purposes of enforcing a

coverage exclusion. *Bay Cities, supra*, 5 Cal. 4th at 873.  In *Bay Cities*, the

California Supreme Court construed an exclusionary clause to determine whether

an attorney's failure to file a stop notice to protect the priority of his client's

mechanic's lien and his subsequent failure to file a timely foreclosure action on

that same lien were "related" acts constituting a single "claim" under the attorney's

malpractice insurance.[26]  The *Bay Cities* court concluded that the term "related" in

the exclusionary clause encompassed both logical and causal connections.[27]  *Id.* at

---

[26] The exclusionary clause at issue in *Bay Cities* stated, "[t]wo or more claims **arising out of** a single act, error or omission or a series of related acts, errors or omissions shall be treated as a single claim". *Id.* (Emphasis added.)

[27] In doing so, the Court looked to the dictionary definition of the term "related" to determine its meaning. *Id.* This Court has already held that, "dictionary definitions are an appropriate consideration in evaluating the ordinary meaning of terms in an insurance contract." *Northrop, supra*, 563 F.3d at 784 n.4.  The term "interrelated" is defined as: "Mutually related or connected." *The Oxford English*

867. The court warned, however, that "the term 'related' would [not] encompass every conceivable logical relationship. At some point, a relationship between two claims, though perhaps 'logical,' might be so attenuated or unusual that an objectively reasonable insured could not have expected they would be treated as a single claim under the policy." *Id.* The court applied this standard to find "related" two errors made by an attorney on the grounds that "[t]hey arose out of the same specific transaction, the collection of a single debt. They arose as to the same client. They were committed by the same attorney. [And] [t]hey resulted in the same injury, loss of the debt." *Id.*

HBD and *Tripp*, however, have no such facts in common. The **only** arguable relationship between *HBD* and *Tripp* is that both involve criticism of loans (albeit different loan transactions and types of loans) in violation of underwriting policies (albeit different underwriting polices) made by business units under the IndyMac umbrella (albeit different business units). But under *Bay Cities,* that attenuated relationship is not enough. Rather, the claims in the *HBD Action* are "so attenuated or unusual" from the *Tripp Litigation* claims "that an objectively

---

*Dictionary* 417 (1961); *see also Merriam-Webster New Collegiate Dictionary* 604 (1977) ("having a mutual or reciprocal relation or parallelism"). The terms "relate" or "related" are defined as: "to show or establish logical or causal connection between – ". *Merriam-Webster New Collegiate Dictionary* 975 (1977) ("Relate"); *see also Webster's Third New International Dictionary* 1916 (1993) ("connected by reason of an established or discoverable relation") ("Related"); *The Oxford English Dictionary* 397 (1961) ("Having relation *to,* or relationship *with,*

reasonable insured could not have expected they would be treated as a single claim under the policy" and excluded from coverage.

Instead of applying the analysis mandated by *Financial Management Services, Eureka* and *Bay Cities,* the district court relied on an intermediate appellate court insurance decision—*Medill v. Westport Ins. Corp.*, 143 Cal. App. 4th 819 (2006)—that contains language broadly interpreting the phrases "arising out of" and "based upon."[28] (E.R. 15.) But *Medill* is readily distinguishable.

In *Medill*, unlike here, there was an obvious, meaningful connection between the claims at issue and the policy's exclusion language. There, the officers and directors of a non-profit organization were sued by a class of bondholders for damages from their default on their contractual payment obligations on a series of municipal bonds, and by U.S. Trust for mismanagement for failing to make payments on the notes and bonds when due (collectively, the "Bond Litigation"). *Id.* at 823-825. The policyholders tendered their defense to the insurer, who denied coverage because the policy did not cover loss "arising out of" claims for breach of contract. *Id.* at 825-826.

---

something else") ("Related") (emphasis in original).
[28] The district court cited *Bay Cities* one time in its order for general contract interpretation principles but did not discuss its facts or its application to this case. (E.R. 14.)  It did not cite this Court's controlling authority *Financial Management Advisors* or *Eureka* at all. (E.R. 10-20.)

The policyholders argued that the exclusions did not apply because the claims brought against them were tort claims—wrongful acts covered under the policy—and thus were not subject to the exclusion for claims "arising out of" breach of contract claims.  In rejecting this argument, the appellate court looked beyond the legal theory of liability to the essence of the conduct creating liability—the policyholders' failure to meet their contractual payment obligations. *Id.* at 830-831. The court interpreted "arising out of" to hold that the claims against the directors and officers were not covered because "[n]o aspect of the underlying bond litigation would exist without the alleged breaches of the loan agreements and indentures and the contractual obligations to pay on the bonds."[29]   *Id.*

Here, in sharp contrast, the *HBD* and *Tripp* claims share no common core "event" creating liability.  The "arising out of" language in the Tower 2 *Tripp* exclusion cannot be stretched to treat claims that have nothing meaningful in common as a single claim.

---

[29] Other California courts have interpreted the phrase "arising out of" differently depending on whether the phrase appears in a coverage clause or an exclusionary clause; the former is interpreted broadly so as to afford the greatest possible protection to the insured whereas as the latter is interpreted narrowly so as to not take away any coverage. *State Farm Mut. Auto. Ins Co. v. Partridge*, 10 Cal. 3d 94, 101–102, 514 P.2d 123, 109 Cal. Rptr. 811 (1973) (interpreting "arising out of" broadly as used in a coverage or insuring clause); accord *Charles E. Thomas Co. v. Transamerica Ins. Group*, 62 Cal. App. 4th 379, 383–384, 72 Cal. Rptr. 2d 577 (1998) (interpreting "arising out of" as used in a pollution exclusion narrowly.)

In sum, no matter how broadly one defines the phrase "arising out of", the claims in *HBD* involving negligent approval of specific short-term, AD&C loans to homebuilders do not "arise out of", and are wholly unrelated to, the claims in *Tripp* involving misrepresentations about IndyMac's mortgage departments' underwriting and securitization of thousands of long-term *residential* mortgages. This case is governed by *Bay Cities*' holding that claims that are attenuated or unusual cannot be treated as a single claim for purposes of enforcing a policy exclusion.

## CONCLUSION

*Tripp* and *HBD* are not sufficiently related to be considered a single Claim. Thus, *HBD* is covered under the Tower 2 policies as a matter of law. This Court should reverse the district court's ruling that coverage for *HBD* is precluded by the Interrelated Wrongful Acts limitation and the Prior Notice and Specific Litigation exclusions and hold the *HBD Action* covered under Tower 2.

Respectfully submitted,

COLEEN J. BOLES
Assistant General Counsel
LAWRENCE H. RICHMOND
Senior Counsel

April 22, 2013

/s/Jaclyn C. Taner
JACLYN C. TANER
Counsel
FEDERAL DEPOSIT INSURANCE
CORPORATION
3501 Fairfax Drive, VS-D7006
Arlington, VA 22226-3500

Telephone:  (703) 562-2373
Facsimile:  (703) 562-2496

April 22, 2013

/s/ Thomas D. Long
THOMAS D. LONG
NOSSAMAN LLP
777 S. Figueroa Street
34th Floor
Los Angeles, California 90017
Telephone:  (213) 612-7800
Facsimile:  (213) 612-7801

*Attorneys for Appellant Federal Deposit
Insurance Corporation as Receiver for
IndyMac Bank, F.S.B.*

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, the FDIC is not aware of any related cases pending in this Circuit other than those appeals (Nos. 12-56296, 12-56311, 12-56337, 12-56347 & 12-56350) presently pending in this Court that are already listed as member cases to this lead case (No. 12-56275).

Respectfully submitted,

COLEEN J. BOLES
Assistant General Counsel
LAWRENCE H. RICHMOND
Senior Counsel

April 22, 2013 /s/Jaclyn C. Taner
JACLYN C. TANER
Counsel
FEDERAL DEPOSIT INSURANCE
CORPORATION
3501 Fairfax Drive, VS-D7006
Arlington, VA 22226-3500
Telephone: (703) 562-2373
Facsimile: (703) 562-2496

April 22, 2013 /s/ Thomas D. Long
THOMAS D. LONG
NOSSAMAN LLP
777 S. Figueroa Street, 34th Floor
Los Angeles, California 90017
Telephone: (213) 612-7800
Facsimile: (213) 612-7801

*Attorneys for Appellant Federal Deposit Insurance Corporation as Receiver for IndyMac Bank, F.S.B.*

## RULE 32(a)(7)(C) CERTIFICATE OF COMPLIANCE

Undersigned counsel certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 9,075 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), as calculated using Microsoft Word 2003.

Undersigned counsel further certifies that this brief complies with the type-face requirements of Fed. R. App. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced 14-point Times New Roman typeface using Microsoft Word 2003.

Respectfully submitted,

COLEEN J. BOLES
Assistant General Counsel
LAWRENCE H. RICHMOND
Senior Counsel

April 22, 2013

/s/Jaclyn C. Taner
JACLYN C. TANER
Counsel
FEDERAL DEPOSIT INSURANCE
CORPORATION
3501 Fairfax Drive, VS-D7006
Arlington, VA 22226-3500
Telephone: (703) 562-2373
Facsimile: (703) 562-2496

April 22, 2013

/s/ Thomas D. Long
THOMAS D. LONG
NOSSAMAN LLP
777 S. Figueroa Street, 34th Floor
Los Angeles, California 90017
Telephone: (213) 612-7800
Facsimile: (213) 612-7801

39

*Attorneys for Appellant Federal Deposit
Insurance Corporation as Receiver for
IndyMac Bank, F.S.B.*

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 22, 2013.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Kyle P. Barrett
Tressler, LLP
Ste. 4701
One Penn Plaza
New York, NY 10119

Lee R. Bogdanoff
Klee, Tuchin, Bogdanoff & Stern LLP
1999 Avenue of the Stars
39th Floor
Los Angeles, CA 90067-6049

Theodore A. Boundas
Boundas Skarzynski Walsh & Black
LLC
Ste. 7200
200 East Randolph Drive
Chicago, IL 60601

Michael R. Delhagen
Tressler, LLP
Ste. 4701
One Penn Plaza
New York, NY 10119

Ross B. Edwards
Bates Carey Nicolaides LLP
Ste. 2400
191 North Wacker Drive
Chicago, IL 60606

Ommid C. Farashahi
Bates Carey Nicolaides LLP
Ste. 2400
191 North Wacker Drive
Chicago, IL 60606

Peter F. Lovato
Boundas Skarzynski Walsh & Black
LLC
200 East Randolph Drive, Suite 7200
Chicago, IL 60601

Damian J. Martinez, Esq.
Corbin, Athey & Martinez LLP
Suite 1150
601 West Fifth Street
Los Angeles, CA 90071-2024

Ira Revich
Charlston Revich & Wollitz, LLP
Suite 1250
1925 Century Park East
Los Angeles, CA 90067-2746

David Simantob
Tressler LLP
Suite 450
1901 Avenue of the Stars
Los Angeles, CA 90067-6006

W. Joel Vander Vilet
Boundas Skarzynski Walsh & Black
LLC
200 East Randolph Drive, Suite 7200
Chicago, IL 60601

Respectfully submitted,

April 22, 2013

/s/ Jennifer L. Meeker
JENNIFER L. MEEKER
NOSSAMAN LLP
777 S. Figueroa Street
34th Floor
Los Angeles, California 90017
Telephone:  (213) 612-7800
Facsimile:  (213) 612-7801
*Attorneys for Appellant Federal Deposit*
*Insurance Corporation as Receiver for*
*IndyMac Bank, F.S.B.*

# ADDENDUM A

## "INTERRELATED WRONGFUL ACTS" LIMITATION

## I.    KEY PROVISIONS FROM THE SIDE ABC POLICIES

### DEFINITIONS

L.    **"Interrelated Wrongful Acts"** means **Wrongful Acts** which have as a common nexus any fact, circumstance, situation, event, transaction, or series of facts, circumstances, situations, events or transactions.

Y.    **"Wrongful Act"** means any **Corporate Act** or **Individual Act**.

### LIMIT OF LIABILITY, RETENTIONS AND ORDER OF PAYMENTS

C.    More than one **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to constitute a single **Claim** and shall be deemed to have been made at the earliest of the following times:

1.    the time at which the earliest **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** is first made; or

2.    the time at which the **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to have been made pursuant to Clause VI.B. (E.R. 382-383)

### POLICIES

(The following D&O policies include or incorporate the above "Interrelated Wrongful Acts" limitation provisions set forth in Section I, Addendum A.)

1. 2007-2008 Lloyd's Underwriters Syndicates Nos. 2987 (50%) and 4000 (25%) and Lexington Insurance Company (25%), Policy No. 509/QA006807;
2. 2007-2008 Zurich American Insurance Company, Policy No. DOC 9035134 00;
3. 2007-2008 Federal Insurance Company, Policy No. 8208-0386;
4. 2007-2008 National Union Fire Insurance Co. of Pittsburgh, Pa., Policy No. 966-82-76;

5. 2008-2009 Lloyd's Underwriter Syndicates Nos. 2987 (50%) and 4000 (25%) and Catlin Insurance Company (25%), Policy No. 509/QA011608
6. 2008-2009 Zurich American Insurance Company, Policy No. DOC 9035134 01;
7. 2008-2009 Twin City Fire Insurance Co., Policy No. 00 DA 0248886-08; and
8. 2008-2009 Continental Casualty Company, Policy No. DOX 287221440.

## II.  **KEY PROVISIONS FROM THE SIDE-A POLICIES**

**DEFINITIONS**

(J)  **"Interrelated Wrongful Acts"** means any **Wrongful Act** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any of the same or related, or series of related, facts, circumstances, situations, transactions or events.

(P)  **"Wrongful Act"** means:
1. any actual or alleged act, error or omission, misstatement, misleading statement, neglect, or breach of duty by any **Insured Person** while acting in his or her capacity as an:

   (i)  **Insured Person** of the **Company** or a person serving in a functionally equivalent role for the **Parent Company** or any **Subsidiary**;

   (ii)  **Insured Person** of the **Company** who, with the knowledge and consent of the **Company**, is serving as a director, officer, trustee, regent or governor of an **Outside Entity**; and

2. any Employment Practices Wrongful Act;

3. any matter asserted against an **Insured Person** solely by reason of his/her serving as a director or officer of the **Company** or an **Outside Entity**.

**CONDITIONS**

(G)  **Interrelated Claims**

All **Claims** arising from the same **Interrelated Wrongful Acts** shall be deemed to constitute a single **Claim** and shall be deemed to have been made at the earliest time at which the earliest such **Claim** is made or deemed to have been made pursuant to CONDITION (D)(1) and (2) above, if applicable.

**POLICIES**

(The following D&O policies include or incorporate the above "Interrelated Wrongful Acts" limitation provisions set forth in Section II, Addendum A.)

1. 2007-2008 XL Specialty Insurance Company, Policy No. ELU096700-07;
2. 2007-2008 Arch Insurance Company, Policy No. ABX0020231-00 ("Conditions" provision only);
3. 2007-2008 ACE American Insurance Company, Policy No. DOX G21681647 002 ("Conditions" provision only);
4. 2007-2008 Axis Reinsurance Company, Policy No. RNN 712064/01/2007
5. 2008-2009 XL Specialty Insurance Company, Policy No. ELU103295-08;
6. 2008-2009 Arch Insurance Company, Policy No. ABX0020231-01;
7. 2008-2009 ACE American Insurance Company, Policy No. DOX G21681647 003 ("Conditions" provision only); and
8. 2008-2009 Axis Insurance Company, Policy No. MNN 712064/01/2008.

## III.   **KEY PROVISIONS FROM ARCH AND ACE POLICIES**

**DEFINITIONS**

"**Interrelated Wrongful Acts**" mean all **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of related facts, circumstances, situations, events, transactions or causes.

**POLICIES**

(The following D&O policies include or incorporate the above "Interrelated Wrongful Acts" definition set forth in Section III, Addendum A.)

1. 2007-2008 Arch Insurance Company, Policy No. ABX0020231-00;
2. 2007-2008 ACE American Insurance Company, Policy No. DOX G21681647 002; and
3. 2008-2009 ACE American Insurance Company, Policy No. DOX G21681647 003.

## ADDENDUM B

## SPECIFIC LITIGATION OR *TRIPP* EXCLUSION

I.    **KEY PROVISIONS FROM THE SIDE ABC POLICIES**

**SPECIFIC LITIGATION EXCLUSION AND INTERRELATED WRONGFUL ACTS ENDORSEMENT**

It is hereby understood and agreed as follows:

A.    that Clause III. EXCLUSIONS is amended by the addition of the following:

"based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving the following:

1.    the litigation styled *Wayman Tripp and Sven Mossberg v. Indymac Bancorp, Inc., Michael W. Perry, and Scott Keys*, initiated 12 March 2007, in the United Sates District Court for the Central District of California under the caption *Claude A. Reese v. Indymac Financial Inc., Richard A. Wohl, and Scott Keys*, case number 2:07-cv-1635-GW-VBK (the "Tripp Litigation"); or

2.    any fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events or transactions underlying or alleged in the Tripp Litigation.

regardless of any legal theory upon which such Claim is predicated." (E.R. 230)

**POLICIES**
(The following D&O policies include or incorporate the above "Specific Litigation Exclusions and Interrelated Wrongful Acts Endorsement" set forth in Section I, Addendum B.)

1.    2008-2009 Lloyd's Underwriter Syndicates Nos. 2987 (50%) and 4000 (25%) and Catlin Insurance Company (25%), Policy No. 509/QA011608

2.    2008-2009 Zurich American Insurance Company, Policy No. DOC 9035134 01;

46

3. 2008-2009 Twin City Fire Insurance Co., Policy No. 00 DA 0248886-08; and

4. 2008-2009 Continental Casualty Company, Policy No. DOX 287221440.

## II.  **KEY PROVISIONS FROM THE SIDE-A INSURERS**

**SPECIFIC LITIGATION EXCLUSION ENDORSEMENT**

In consideration of the premium charged, no coverage shall be available under this Policy for any Claim based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving the following:

1. the litigation styled *Wayman Tripp and Sven Mossberg v. Indymac Bancorp, Inc., Michael W. Perry, and Scott Keys*, initiated 12 March 2007, in the United Sates District Court for the Central District of California under the caption *Claude A. Reese v. Indymac Financial Inc., Richard A. Wohl, and Scott Keys*, case number 2:07-cv-1635-GW-VBK (the "Tripp Litigation"); or

2. any fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events or transactions underlying or alleged in the Tripp Litigation.

regardless of any legal theory upon which such Claim is predicated.

All other terms, conditions and limitations of this Policy remain unchanged.

## **POLICIES**
(The following D&O policies include or incorporate the above "Specific Litigation Exclusion Endorsement" set forth in Section II, Addendum B.)

1. 2008-2009 XL Specialty Insurance Company, Policy No. ELU103295-08;
2. 2008-2009 Arch Insurance Company, Policy No. ABX0020231-01;
3. 2008-2009 ACE American Insurance Company, Policy No. DOX G21681647 003; and
4. 2008-2009 Axis Insurance Company, Policy No. MNN 712064/01/2008.

47

# ADDENDUM C

## PRIOR NOTICE EXCLUSION

### III.   KEY PROVISION FROM THE SIDE ABC POLICIES

**EXCLUSIONS**

Underwriters shall not be liable to make any payment in connection with any Claim:

B.   based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving:

1.   any **Wrongful Act** or any fact, circumstance or situation which has been the subject of any notice given prior to the **Policy Period** under any other Directors' and Officers' or Employment Practices Liability policy, or

2.   any other **Wrongful Act** whenever occurring, which, together with a **Wrongful Act** which has been the subject of such notice, would constitute **Interrelated Wrongful Acts**.

**POLICIES**

(The following D&O policies include the above Exclusion set forth in Section I, Addendum C.)

1.   2008-2009 Lloyd's Underwriter Syndicates Nos. 2987 (50%) and 4000 (25%) and Catlin Insurance Company (25%), Policy No. 509/QA011608;

2.   2008-2009 Zurich American Insurance Company, Policy No. DOC 9035134 01; and

3.   2008-2009 Continental Casualty Company, Policy No. DOX 287221440.

### IV.   KEY PROVISION FROM THE TWIN CITY POLICY

**EXCESS ABSOLUTE PRIOR NOTICE EXCLUSION (ENDORSEMENT NO. 3)**

This endorsement modifies insurance provided under the following:

UNIVERSAL EXCESS POLICY

In addition to any exclusions made part of the Underlying Insurance, the following exclusion shall apply to this policy:

Underwriters shall not be liable to make any payment for loss in connection with

48

any claim made against the Insured(s) where all or part of such claim is, directly or indirectly, based on, attributable to, arising out of, resulting from, or in any manner related to wrongful acts or any facts, circumstances or situations of which notice of claim or occurrence which could give rise to a claim, has been given prior to the effective date of this policy under any other policy.

All other terms and conditions remain unchanged.

**POLICIES**
(The following D&O policy includes the above "Excess Absolute Prior Notice Exclusion" set forth in Section II, Addendum C.)

1. Twin City Fire Insurance Co., Policy No. 00 DA 0248886-08.

## V.   KEY PROVISION FROM THE SIDE-A POLICIES

**EXCLUSIONS**

(B)   The Insurers shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Insured Person:**

    (2)   based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance or situation, transaction, event or **Wrongful Act** which, before the inception Date of this Policy, was the subject of any notice given under any other Management Liability Insurance, Directors' and Officers' insurance, or any other similar insurance.

**POLICIES**
(The following D&O policies include or incorporate the above Exclusion set forth in Section III, Addendum C.)

1. 2008-2009 XL Specialty Insurance Company, Policy No. ELU103295-08;
2. 2008-2009 Arch Insurance Company, Policy No. ABX0020231-01;
3. 2008-2009 Axis Insurance Company, Policy No. MNN 712064/01/2008.

## VI.   KEY PROVISION FROM THE ACE POLICY

**PRIOR OR PENDING PROCEEDING EXCLUSION ENDORSEMENT NO. 3.**

49

3.    The following new Section is added:

**EXCLUSIONS**

The Insurer shall not be liable for Loss on account of any Claim:

- Prior or Pending Proceeding

   alleging, based upon, arising out of, or attributable to:

   ii)    any other Wrongful Act whenever occurring which, together with a
   Wrongful Act underlying or alleged in such prior or pending
   proceeding, would constitute Interrelated Wrongful Acts.

**<u>POLICIES</u>**
(The following D&O policy includes or incorporate the above "Prior or Pending
Proceeding Exclusion" set forth in Section IV, Addendum C.)

4.  2008-2009 ACE American Insurance Company, Policy No. DOX
    G21681647 003